TEXAS WORKERS' COMPENSATION COMMISSION, et al., Petitioners,

v.

Hector GARCIA, Jr., et al., Respondents.

No. D–4270.

Supreme Court of Texas.

Argued May 11, 1994.

Decided Feb. 9, 1995.

506

Delmar L. Cain, Shannon H. Ratliff, Scott Moore, Marc O. Knisely, Dan Morales, Austin, for petitioners.

Bill Whitehurst, David R. Richards, Austin, Robert Serna, Crystal City, Robert R. Puente, Jon R. Alworth, San Antonio, for respondents.

PHILLIPS, Chief Justice, delivered the opinion of the Court, in which GONZALEZ, HECHT, CORNYN, ENOCH, and OWEN, Justices, join.

This case requires us to decide whether various provisions of the Texas Workers' Compensation Act facially violate the Texas Constitution's guarantees of open courts, due course of law, equal protection, jury trial, and obligation of contract. We reverse the judgment of the court of appeals, 862 S.W.2d 61, and uphold the constitutionality of the Act.

## I

In 1989, the Legislature enacted a new Workers' Compensation Act[1] restructuring workers' compensation in Texas. To understand the new Act and its effect on claims by injured workers, we must first review the compensation system it replaced.

## A

Texas first enacted workers' compensation legislation in 1913 to meet the needs of an increasingly industrialized society. Despite escalating industrial accidents, under the common law most injured workers were denied recovery. *See Research Papers of the Joint Select Committee on Workers' Compensation Insurance* ch. 1 at 2 (1988) (hereinafter "*Research Papers*"). Not only was negligence often difficult to prove in an industrial setting, but employers could also invoke as complete defenses the common law doctrines of contributory negligence, assumption of the risk, and fellow servant.

The Employers' Liability Act of 1913 replaced the common law negligence remedy with limited but more certain benefits for

---

1. The new Act, initially located in articles 8308–1.01 through 8308–11.10 of Texas Revised Civil Statutes Annotated, was codified in September 1993, after the court of appeals' decision in this case. *See* Tex.Lab.Code § 401.001, et seq. For convenience, we refer to the Labor Code sections.

injured workers. Acts 1913, 33rd Leg., ch. 179. The Texas act, which was part of a nationwide compensation movement, was perceived to be in the best interests of both employers and employees. *See Research Papers* ch. 1 at 6. Employees injured in the course and scope of employment could recover compensation without proving fault by the employer and without regard to their or their coworkers' negligence. Acts 1913, ch. 179, pt. I, §§ 7–12. In exchange, the employer's total liability for an injury was substantially limited. *Id.* § 3. Although employers were allowed to opt out of the system, the act discouraged this choice by abolishing all the traditional common law defenses for nonsubscribers.[2] *Id.* § 1.

### 1

The intent of the former act was to compensate for medical costs and loss of *wage earning capacity* caused by a work-related injury. Although modified on numerous occasions over the years, the act's basic structure never changed. As of 1989, totally incapacitated employees could recover two-thirds of their average weekly wage for up to 401 weeks.[3] Tex.Rev.Civ.Stat.Ann. art. 8306, § 10 (repealed by Acts 1989, 71st Leg., 2nd C.S., ch. 1, § 16.01(7)). Partially incapacitated employees could recover two-thirds of the difference between their average weekly wage and their post-injury weekly earning capacity for up to 300 weeks, subject to an aggregate maximum of 401 weeks for periods of total and partial incapacity. *Id.* § 11.

Disability from injury was generally referred to as either "temporary" or "permanent" depending on whether it was likely to persist beyond the maximum benefit period. Thus, an injury causing complete incapacity

for at least 401 weeks was the functional equivalent of "permanent total" disability, while an injury causing partial incapacity for at least 300 weeks was the functional equivalent of "permanent partial" disability. Conversely, an injury that totally incapacitated a worker for less than 401 weeks was a "temporary total" disability. *See Research Papers* ch. 2 at 11–14.

The former act also provided lifetime benefits for certain injuries conclusively presumed to be totally and permanently incapacitating, such as loss of both feet or both hands, and long-term death benefits for the beneficiaries of a fatally injured employee. Art. 8306, §§ 8, 11a. For certain other "specific injuries," the act mandated specific compensation in lieu of all other wage-loss benefits. *Id.* § 12. For loss of a thumb, for example, the employee was entitled to two-thirds of the average weekly wage for 60 weeks. *Id.*

The weekly benefits for death, total incapacity, or a specific injury were subject to a statutory maximum and minimum, while the benefits for partial incapacity were subject only to the statutory maximum. *Id.* §§ 8(a), 10(a), 11, 12. These upper and lower limits on the weekly benefit were adjusted annually based on Texas Employment Commission statistics, *id.* § 29, and in 1988 were $238 and $40, respectively. *See Research Papers* ch. 2 at 9. The former act also compensated for all medical costs of a work-related injury, without limit as to amount or duration. Art. 8306, § 7.

### 2

The Industrial Accident Board, a three-member panel appointed by the Governor, administered the former compensation system. *See generally* Tex.Rev.Civ.Stat.Ann.

2. In 1917, individual employees of subscribing employers were also given the option of electing out of the system. *See Acts 1917, 35th Leg., ch. 103, § 1.* Those opting out retained their common law right of action, which remained subject to all common law defenses. *See* Tex.Rev.Civ.Stat.Ann. art. 8306, § 3a (repealed by Acts 1989, 71st Leg., 2nd C.S., ch. 1, § 16.01(7)).

3. The former act calculated average weekly wage under a rather convoluted formula based on a 300 day work-year. Tex.Rev.Civ.Stat.Ann. art. 8309 § 1 (repealed by Acts 1989, 71st Leg., 2nd

C.S. ch. 1, § 16.01(15)). The employee's wages earned during the year preceding injury were divided by the number of days actually worked during that year, producing an average daily wage. This daily wage was then multiplied by 300 to produce the annual wage, which was then divided by 52 to produced the average weekly wage. Because there are only 260 work days in a year (52 weeks × 5 days), the 300 day rule inflated the average weekly wage, raising the effective benefit to 77% of gross pay. *See Research Papers* ch. 3 at 69.

art. 8307 (repealed by Acts 1989, 71st Leg., 2nd C.S., ch. 1, § 16.01(10)). The Board and its staff monitored work-place injuries, seeking to resolve disputes between claimants and insurers. The adjudicative process began with a "prehearing conference," an informal meeting of the parties presided over by a prehearing officer. *Id.* § 10. Witnesses were not sworn and no record was made, and "no matter occurring during, or fact developed in, a pre-hearing conference [could be] deemed as admissions or evidence or impeachment against the association, employee or the subscriber in any other proceedings except before the Board." *Id.* Under the prehearing officer's guidance, the parties attempted to mutually resolve the disputed issues. If successful, they could enter into binding settlement agreements, subject to Board approval.[4] *Id.* § 12.

For claims not settled, the prehearing officer prepared a report stating the officer's recommendations for the award and the basis therefor. *Id.* § 10. These claims then proceeded to the Board for formal hearing. *Id.* Although the parties could appear and give sworn testimony, in most cases the Board simply reviewed its claim file, usually approving the prehearing officer's recommended award. *See Research Papers* ch. 2 at 33.

Any party dissatisfied with the Board decision could appeal to court. Art. 8307 § 5. All issues were subject to de novo review under the normal rules of procedure, including the right to a jury trial on disputed factual issues. *Id.* Settlements were subject to court approval, *id.* § 12a, as was the claimant's attorney's fee, which could not exceed 25 percent of the recovery. Art. 8306 § 7d. At trial, the Board award was inadmissible.

B

Satisfaction with the former workers' compensation system was never high. A detailed study in 1938 concluded that the system was a "genuine source of embarrassment" in need of "immediate and constructive reform." Karl E. Ashburn, *Report on Texas Workmen's Compensation Insurance Act and Its* *Administration with Recommendations for Improvement* 7 (1938). Ashburn recommended, among other changes, making coverage mandatory, strengthening the Board, limiting settlement agreements, and eliminating trial de novo.

By the 1980s, loss of confidence in the system had reached crisis proportions. Beginning in 1983, the percentage of claims with indemnity (wage loss) payments began to increase dramatically, as did the proportion of indemnity claims with payments for permanent disability. Joint Select Committee on Workers' Compensation Insurance, *A Report to the 71st Texas Legislature* 3 (1988). Medical costs for injured workers also began increasing at a much higher rate than medical costs outside the compensation system. *Id.* These increases helped cause compensation insurance premiums to more than double between 1984 and 1988. *Id.* at 1. By 1988, the cost of workers' compensation to Texas employers was among the highest in the nation. *Id.* at 4. Business groups claimed that these spiralling costs forced large businesses to locate operations elsewhere and forced small businesses to cease operations or opt out of coverage. *Id.* at 1.

Despite these high costs, the system was also widely perceived to be unfair to injured workers. *Id.* In July 1987, the Legislature created the Joint Select Committee on Workers' Compensation Insurance to study the system and propose changes. After numerous public hearings and meetings, the Committee identified several inequitable features of the former act, including 1) the low statutory maximum benefit, 2) the 401–week limit on benefits, 3) the settlement of claims prior to stabilization of the claimant's medical condition, 4) the subjective "loss of wage earning capacity" standard, and 5) inconsistent jury awards based on geographical location. *Report of Joint Select Committee* at 4. The Committee concluded that persons with serious long-term injuries received benefits "among the very lowest in the nation," while those with minor injuries received relatively high benefits. *Id.* The Committee also

---

4. 40,000 prehearing conferences were held in 1987, 23,000 of which resulted in settlement agreements. *See Research Papers* ch. 2 at 32.

found that the system suffered from the Board's relative lack of power, and concluded that the delay and cost of de novo review forced premature and inaccurate settlements. *Id.* at 5.

The Committee also discovered that, between 1983 and 1987, the level of attorney involvement in Texas rose from 36 percent to 50 percent of all claims. *Research Papers* ch. 4 at 100–101. By comparison, a 1987 survey of seventeen other jurisdictions found attorney involvement in only 7.8 percent of all claims. *See* National Council on Compensation Insurance, *Workers Compensation Claim Characteristics* 58 (1987). This disparity existed even though the percentage of compensation claims in Texas formally controverted by the insurance carrier (8.8 percent) was only slightly higher than the average in the other seventeen surveyed jurisdictions (7.2 percent). *Research Papers* ch. 4 at 101; *Workers Compensation Claim Characteristics* at 58.

The Committee made numerous recommendations, including the following: 1) make the system more objective by awarding benefits, at least in part, on the basis of physical impairment rather than loss of wage earning capacity; 2) utilize a neutral doctor to resolve disputes; 3) prohibit the settlement of medical benefits; 4) increase the statutory maximum; 5) extend the duration of permanent disability payments; and 6) vest the Board with authority to render binding findings, subject to judicial review only under the substantial evidence rule. *Report of Joint Select Committee* at 10–19.

C

1

In December 1989, a year after the Committee issued its report, the Legislature passed the new Act. This legislation, which became effective January 1, 1991, reflects many of the Committee's recommendations. Like the former law, it compensates for all medical costs flowing from a compensable injury, with no limit as to amount or time.

Tex.Lab.Code § 408.021. It also mandates four levels of income benefits: 1) temporary income benefits; 2) impairment income benefits; 3) supplemental income benefits; and 4) lifetime benefits. *See generally Id.* §§ 408.081–408.162.

Temporary income benefits compensate for lost wages while an injured employee is convalescing. They accrue when the employee suffers a disability and continue until "maximum medical improvement." *Id.* §§ 408.101, 408.102. "Disability" simply means the "inability because of a compensable injury to obtain and retain employment at wages equivalent to the preinjury wage," and thus results from any reduction in wage earning capacity. *Id.* § 401.011(16). "Maximum medical improvement" is the point when further material recovery or lasting improvement can no longer be reasonably anticipated, or two years after income benefits begin to accrue, whichever is sooner. *Id.* § 401.011(30).

These temporary benefits are paid weekly at the rate of 70 percent of the difference between the claimant's average weekly wage and the post-injury weekly earnings,[5] subject to the statutory maximum and minimum. *Id.* § 408.103. The Act rejects the "300 day rule," basing the "average weekly wage" on the actual average wage for the thirteen weeks preceding injury. *Id.* § 408.041(a).

A claimant who is left with an "impairment" after reaching maximum medical improvement becomes eligible for impairment income benefits. *Id.* §§ 408.121, 408.122. An impairment is defined as

> any anatomic or functional abnormality or loss existing after maximum medical improvement that results from a compensable injury and is reasonably presumed to be permanent.

*Id.* § 401.011(23). The claimant's "impairment rating," which is the percentage of permanent impairment of the whole body, is determined by a physician utilizing the American Medical Association's *Guides to the Evaluation of Permanent Impairment* (the

---

**5.** There is an adjustment for workers earning less than $8.50 per hour, *id.* § 408.103(a)(2), which

we address in part VIII–B of this opinion.

"*Guides*"). *Id.* §§ 401.011(24), 408.124. The statute appears to contemplate that both the claimant's and the carrier's physician may make an impairment determination. If their findings conflict, the claimant must be examined by a "designated doctor" selected by mutual agreement of the parties or by the Commission.[6] *Id.* § 408.125. The designated doctor's rating is binding on the Commission if he or she was selected by the parties, while the rating has presumptive weight if the doctor was selected by the Commission. *Id.* In the latter case, the presumption is overcome only if the great weight of the other medical evidence is to the contrary, in which case the Commission must adopt the impairment rating of "one of the other doctors." *Id.*

Impairment benefits are paid at the rate of 70 percent of the claimant's average weekly wage, subject to the statutory maximum and minimum. *Id.* § 408.126. Benefits begin the day after maximum medical improvement and continue for three weeks for every percentage point of impairment. *Id.* § 408.121(a). For example, a claimant who is 10 percent impaired would receive these benefits for thirty weeks. Impairment income benefits are intended to compensate for the impairment itself, and thus are payable without regard to post-injury wages or wage earning capacity.

Supplemental income benefits provide long-term disability compensation. They become payable upon termination of the impairment benefits, but only if the claimant has an impairment rating of 15 percent or more and is earning less than 80% of his or her preinjury average weekly wage as a direct result of the injury. *Id.* § 408.142. These benefits, which are recalculated every quarter, are paid at the weekly rate of 80 percent of the difference between 80 percent of the preinjury average weekly wage and the weekly wage earned during the quarterly reporting period.[7] *Id.* § 408.144(a), (b). A claimant remains eligible for supplemental benefits

until 401 weeks after the date of injury. *Id.* § 408.083. Thus, the maximum duration of income compensation is identical under both the new and old systems.

Lifetime benefits are payable for certain severe injuries, such as loss of both feet or both hands, at the rate of 75 percent of the preinjury average weekly wage, subject to the statutory maximum. *Id.* § 408.161. The Act also provides long-term death benefits at the same rate as lifetime benefits. *Id.* §§ 408.181–408.187.

The maximum temporary benefit is 100 percent of the state average weekly wage for manufacturing production workers.[8] *Id.* § 408.061(a). In 1991 it equaled $426, a significant increase over the maximum benefit under the former act. The maximum impairment and supplemental benefit is 70 percent of the state average, while the minimum temporary and impairment benefit is 15 percent of the state average. *Id.* §§ 408.061(b), (c); 408.062(a).

The Act also addresses the problem of premature settlements. An insurer's liability for lifetime medical care may not be settled or compromised under any circumstances, *id.* § 408.021(d), and a settlement involving an issue of impairment may not be made before the employee reaches maximum medical improvement. *Id.* § 410.256(c).

### 2

The Act also strengthens the enforcement and adjudicatory powers of the Commission. It expressly defines numerous "administrative violations," *id.* § 415.001, empowering the Commission to punish violators with fines up to $10,000. *Id.* § 415.021.

The Commission resolves disputed claims through a three-stage hearing process: 1) the benefit review conference, 2) the contested case hearing, and 3) the administrative appeal. The benefit review conference, like the former prehearing conference, is an informal proceeding aimed at resolving the dis-

---

6. The administering agency under the Act is named the Texas Workers' Compensation Commission. *See* Tex.Lab.Code § 402.001.

7. Supplemental income benefits are also subject to the statutory maximum. *Id.* § 408.144(b).

8. This statistic is calculated annually by the Texas Employment Commission.

puted issues by mutual agreement. *Id.* § 410.021. The presiding "benefit review officer," after "thoroughly inform[ing] all parties of their rights and responsibilities," mediates the dispute. *Id.* § 410.026(a). The officer may direct questions to the parties, but he or she may not take testimony or make a formal record. *Id.* § 410.026(c), (d). The officer does, however, prepare a written report detailing each issue not settled at the conference. *Id.* § 410.031. This report must include the officer's recommendation regarding those issues and a recommendation regarding the payment or denial of benefits. *Id.* The officer may issue an interlocutory order directing the insurer to pay benefits. *Id.* § 410.032.

The parties then proceed to a contested case hearing, a formal evidentiary proceeding with sworn testimony and prehearing discovery procedures.[9] *Id.* §§ 410.151–410.169. The hearing officer decides the disputed issues by written decision containing factual and legal findings, awarding benefits if they are due. *Id.* § 410.168(a). The hearing officer's decision is binding during the pendency of an administrative appeal and is final in the absence of appeal. *Id.* § 410.169.

Any party may appeal the hearing officer's decision to an appeals panel within the Commission. *Id.* § 410.202. The request for appeal and the opposing party's response must "clearly and concisely rebut or support the decision of the hearing officer on each issue on which review is sought." *Id.* § 410.202(c). After considering these briefs and the record from the contested case hearing, the appeals panel may affirm the decision of the hearing officer, reverse and render a new decision, or remand no more than one time to the hearing officer for further consideration and development of the record.[10] *Id.* § 410.203.

### 3

The Commission's final decision may be appealed to the courts under what might best be described as modified de novo review. For all issues regarding compensability of the injury (for example, whether it occurred in the course and scope of employment) and eligibility for and the amount of income and death benefits, there is a right to trial by jury. Tex.Lab.Code § 410.304. The party appealing bears the burden of proof by a preponderance of the evidence. *Id.* § 410.303. The jury, although informed of the Commission decision, is not required to accord it any particular weight. *Id.* § 410.304(a). Further, the opinion of the designated doctor regarding impairment is accorded no special weight.

In determining the extent of impairment, however, the jury must adopt the specific rating of one of the physicians in the case. *Id.* § 410.306(c). Evidence of the extent of impairment is limited to that presented to the Commission[11] unless the court makes a threshold finding that the claimant's condition has substantially changed, in which case new impairment evidence may be introduced. *Id.* §§ 410.306(c), 410.307. If the parties dispute whether the claimant's condition has substantially changed, the court must hear from the designated doctor, whose opinion is controlling on this issue "unless the preponderance of the other medical evidence is to the contrary." *Id.* § 410.307(b). The court's finding of substantial change of condition is not revealed to the jury. *Id.* § 410.307(e).

Issues other than compensability of the injury and eligibility for and the amount of income and death benefits are reviewed by the court under the substantial evidence rule. *Id.* § 410.255.

### D

Notably, the Act considers both *impairment* and *disability* in awarding benefits. As discussed above, impairment refers to the extent of permanent injury without regard to its effect on employment, while disability re-

---

9. The parties may mutually elect binding arbitration as an alternative to the contested case hearing. Tex.Lab.Code § 410.104.

10. If the appeals panel does not decide the case within thirty days after the response is filed, the decision of the hearing officer becomes final and

is deemed to constitute the decision of the appeals panel. Tex.Lab.Code § 410.204.

11. The Commission record is admissible to the extent allowable under the Texas Rules of Civil Evidence. Tex.Lab.Code § 410.306(b).

fers to decreased wage earning ability. For example, if a concert pianist and bank president each lose the fifth finger of their left hand, the extent of impairment to each is the same, while the resulting disability is likely to be much different. *See Guides* at 2 n. 1. Experts agree that both these standards play a proper role in compensation systems. *See, e.g., Report of the National Commission on State Workmen's Compensation Laws* 38 (1972); Arthur Larson, *Workmen's Compensation,* Desk Edition § 57.10 (1988). Impairment benefits compensate for non-economic aspects of an injury, such as decreased ability to engage in social activities and hobbies, while disability benefits compensate for direct economic harm.

Also, long-term benefits under the Act are determined *retrospectively.* That is, supplemental benefits are adjusted periodically over time based on actual lost wages for that period. This contrasts with the former *predictive* system, which fixed benefits at the time of adjudication based on a prediction of the injury's future impact on employment. Studies have shown that a retrospective system is not only more accurate, but also increases an employer's incentive to provide vocational rehabilitation. *See Research Papers* ch. 3 at 45–47.

## II

### A

Plaintiffs brought this suit in district court in Maverick County in November 1990, before the new Act went into effect, challenging its constitutionality. They originally sought declaratory and injunctive relief against the Commission, its executive director, and the private employer of one of the plaintiffs.[12] Other parties representing employer interests later intervened as defendants.[13]

After a hearing in December 1990, the trial court issued a temporary injunction prohibiting the Commission and its executive director from rendering a final decision regarding impairment or supplemental income benefits. After a subsequent non-jury trial on the merits, the court held that various provisions of the Act violated the Texas Constitution's guarantees of equal protection (article I, section 3), open courts (article I, section 13), due course of law (article I, section 19), right to jury trial (article I, section 15 and article 5, section 10), and obligation of contract (article I, section 16). Although the statute contains a severability clause, the court concluded that the unconstitutional portions were too integral to the statutory scheme to be severed out. Therefore, it declared the entire act unconstitutional.

The court's final judgment, however, granted no injunctive relief. Plaintiffs orally withdrew their request for an injunction against the Commission and executive director at trial, and their remaining injunctive claim against the private employer was resolved by a "Mother Hubbard" clause in the judgment denying all relief not expressly granted. Thus, the temporary injunction dissolved when the trial court's judgment was signed on May 22, 1991.

The Commission and executive director then perfected a direct appeal to this Court under section 22.001(c) of the Texas Government Code and Rule 140 of the Texas Rules of Appellate Procedure. We dismissed that appeal, however, as the trial court had not granted or denied injunctive relief against any of the parties to the appeal based on the constitutionality of the statute. *See Texas Workers' Compensation Comm'n v. Garcia,* 817 S.W.2d 60 (Tex.1991). Defendants subsequently perfected an appeal to the court of appeals.

### B

The court of appeals affirmed the judgment of the trial court in most respects. It held that the Legislature, by adopting an impairment-based system utilizing the *Guides,* violated the open courts, due course of law, and equal protection guarantees. The court held that the Act is intended to substitute for the common law negligence remedy, and that one of its purposes is to provide

---

12. This employer did not participate in the trial court and has not been a party to any appeal.

13. These intervenors were the Texas Association of Compensation Consumers, Inc., Klinck Globe, Inc., Klinck Drugstore, Inc., and La Esquina.

adequate wage-loss benefits to injured workers. Because impairment is not an accurate measure of disability, however, the court concluded that the Act's use of impairment operated to deny meaningful benefits to many seriously disabled workers. 862 S.W.2d at 86. Accordingly, the court found the Act to be a constitutionally inadequate substitute under open courts for a workers' common law remedy. *Id.* The court also concluded that the Act's use of the *Guides* violated equal protection in three ways: 1) by unreasonably distinguishing between workers whose injuries are recognized under the *Guides* and those whose injuries are not recognized; 2) by conclusively presuming maximum medical improvement after two years, an unreasonable classification as to those workers whose conditions have not actually stabilized after that time; and 3) by arbitrarily distinguishing between workers receiving an impairment rating of at least 15 percent and those that do not meet this threshold. *Id.* at 87–90. Finding "absolutely no justification" for the 15 percent threshold, the court ruled that it also violated due course of law. *Id.* at 89–90.

The court further concluded that section 406.034, which allows new employees an opportunity to opt out of the Act's coverage but does not allow current employees covered under the former act a similar opportunity, violates equal protection and due course of law. *Id.* at 92–93. The court also found that the Act's method of judicial review, even though it provides for a trial by jury on the principal compensation issues, violates the right to jury trial by 1) requiring the jury to select between predetermined impairment ratings, 2) imposing the arbitrary presumptive effect of the 15 percent threshold, and 3) repudiating the jury's consideration of historical disability considerations, such as loss of

earning capacity. *Id.* at 93–96. Further, by mandating jury trials for some issues and substantial evidence review for others, the Act creates an impermissible system of hybrid review.[14] *Id.* at 96–98.

The court also found that the Act's attorneys' fees provisions violate equal protection and due course of law. Because fees for a claimant's attorney are limited to a maximum of 25 percent of the recovery, and subject to lower caps depending on time, expense and other reasonableness factors, *see* section 408.221, the court concluded that the Act unreasonably impedes claimants from obtaining legal representation, without imposing a similar impediment on insurance carriers. *Id.* at 98–100.

Like the trial court, the court of appeals concluded that the unconstitutional provisions could not be severed out. *Id.* at 104. Therefore, it declared the entire Act invalid. Because plaintiffs no longer sought injunctive relief, however, the court of appeals did not issue an injunction. The Commission has accordingly continued implementing the Act notwithstanding the judgments of the courts below. We granted the applications for writ of error of both the State defendants and the employer defendants to consider the constitutionality of the Act.

### III

#### A

■ Plaintiffs facially challenge several provisions of the new Act. Before addressing the merits, we consider plaintiffs' standing to raise these claims.[15]

■ Standing, which is a necessary component of subject matter jurisdiction, requires a) a real controversy between the parties, which b) will be actually determined

---

14. The court concluded that the Act's use of the *designated doctor was not unconstitutional.* 862 S.W.2d at 90–92. The court also found that the Act did not unconstitutionally discriminate against low-wage or seasonal workers or impair the obligation of contract. *Id.* at 100–103. The court also concluded that the doctrine of sovereign immunity did not bar suit against the Commission and its executive director in his official capacity, 862 S.W.2d at 72–73, an issue not raised by defendants in this Court.

15. Although defendants contested plaintiffs' standing below, they do not do so in this Court. Because standing is a component of subject matter jurisdiction, however, it may be raised by an appellate court sua sponte. *See Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 445–46 (Tex.1993). Further, plaintiffs now challenge the court of appeals' conclusion that two of the plaintiffs lack standing.

by the judicial declaration sought. *Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex.1993). *Cf. Pennell v. City of San Jose*, 485 U.S. 1, 8, 108 S.Ct. 849, 855, 99 L.Ed.2d 1 (1988) (to have standing to challenge a statute, a plaintiff "must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement"). Thus, to challenge a statute, a plaintiff must first suffer some actual or threatened restriction under that statute. Second, the plaintiff must contend that the statute unconstitutionally restricts the *plaintiff's* rights, not somebody else's. *See Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973) ("[A] person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.").

■ Under a facial challenge, such as that asserted here, the challenging party contends that the statute, by its terms, always operates unconstitutionally.[16] *See New York State Club Ass'n v. New York City*, 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988); *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). Therefore, because they bring facial challenges, plaintiffs by definition are contending that the Act operates unconstitutionally as to them. Thus, to satisfy the requirements of standing, they must demonstrate that they are suffering some actual or threatened restriction under the Act.

The plaintiffs are Hector Garcia, John Fuller, Osvaldo Rivera, Texas Legal Services Union Local 2, and the Texas AFL–CIO. The court of appeals held that Garcia and both unions had standing, while Fuller and Rivera did not. We first address the standing of the Texas AFL–CIO, a voluntary association with 215,000 members organized to promote workers' rights.

■ An association may sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Texas Ass'n of Business*, 852 S.W.2d at 447 (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)). We agree with the court of appeals that the Texas AFL–CIO meets these requirements.

The purpose of the first element "is simply to weed out plaintiffs who try to bring cases, which could not otherwise be brought, by manufacturing allegations of standing that lack any real foundation." *Texas Ass'n of Business*, 852 S.W.2d at 447 (quoting *New York State Club Ass'n*, 487 U.S. at 9, 108 S.Ct. at 2232). Evidence at trial indicates that a large majority of Texas AFL–CIO members are covered under the workers' compensation system. Although there was no showing of specific members who have suffered a compensable injury since the effective date of the Act, we may fairly assume the existence of such members based on the size of the union. By doing so, we are not engaging in "unadorned speculation" that the

---

**16.** *Texas Association of Business v. Texas Air Control Board*, 852 S.W.2d 440 (Tex.1993), illustrates this approach. There, we held that conditioning judicial review on prepayment of the administrative penalty violated the open courts doctrine without regard to the amount of the penalty, the party's ability to pay, or other surrounding circumstances. 852 S.W.2d at 450. This type of facial challenge contrasts with an "as applied" challenge, under which the plaintiff argues that a statute, even though generally constitutional, operates unconstitutionally as to him or her because of the plaintiff's particular circumstances. *See, e.g., Nelson v. Krusen*, 678 S.W.2d 918, 922 (Tex.1984) (holding two-year medical limitations statute unconstitutional as applied to a plaintiff who could not discover the injury during the two-year period).

There is also a second type of facial challenge, under which a plaintiff argues that a statute, even though constitutionally applicable to the plaintiff and others, restricts a substantial amount of protected conduct. *See New York State Club Ass'n v. New York City*, 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988); *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). This "overbreadth doctrine," thus far reserved for First Amendment cases, is a narrow exception to the general rule of standing that prohibits a plaintiff from asserting the rights of others. *Id.*

Act will be enforced against AFL–CIO members. *See Pennell*, 485 U.S. at 8, 108 S.Ct. at 855. We are satisfied that the Texas AFL–CIO represents members who would have standing to sue in their own right.

Regarding the second element, there is no dispute that worker benefits are germane to the Texas AFL–CIO's purpose. It actively lobbied regarding the Act, and Joe Gunn, its president, testified at trial that the quality and character of the Texas workers' compensation system is of "paramount concern" to the union.

Finally, because the Texas AFL–CIO seeks only declaratory relief regarding the facial validity of the statute, participation of individual union members is not necessary. This union thus has standing.

■ Because the other plaintiffs, except for Fuller, bring the same facial challenges and seek the same declaratory relief as the Texas AFL–CIO, we need not address their individual standing and we express no opinion thereon.[17] Fuller, on the other hand, appears to assert a separate challenge based on his special circumstances. The trial court found that he suffers from a repetitive-trauma occupational disease to his knees that will continue to be aggravated by his work and will likely cause future disability. Fuller contends that, regardless of the adequacy of the Act's remedy in general, he will be denied all benefits based on the Act's requirement that a claimant notify the employer within 30 days after injury and file a claim within one year after injury. *See* Tex.Lab. Code §§ 409.001, 409.003. For an occupational disease, the date of injury is when "the employee knew or should have known that the disease may be related to the employment." *Id.* § 408.007. Fuller contends that, in his case, that date was several years ago, automatically rendering any future claim for disability benefits untimely. Further, Fuller points out that all benefits under the Act

terminate 401 weeks after the date of injury, a date which has already passed.

We agree with the court of appeals that Fuller's complaint is premature, defeating his standing. Fuller has submitted no claim for benefits under the Act, and may never do so. Even assuming that he will, there is no way to predict what action the Commission may take on that claim. The Act excuses late filings under certain circumstances that may apply, *see* Tex.Lab.Code §§ 409.002, 409.004, and it is not clear whether the Commission would deny benefits to someone in Fuller's position under the 401–week limitation. Until Fuller files a claim which is rejected by the Commission as untimely, no real controversy exists regarding his particular complaints.

**B**

As a second threshold matter, we address the significance of the trial court's findings of fact. The court made sweeping findings as to each aspect of the Act it held to be unconstitutional. Regarding the *Guides*, for example, the court found among other things that 1) "the Act adopts an improper use of the *Guides* ... and that such use of the *Guides* as the determining factor to compensate injured workers for losses occasioned by their injuries is unreasonable and arbitrary and is not reasonably related to any individual or societal interest of the State of Texas;" 2) "the impairment ratings generated from use of the *Guides* have no adequate scientific base" and "have no reasonable relationship to true impairment;" 3) "the 15% threshold as a qualification for supplemental income benefits is arbitrary in and of itself, and further that it is based upon an impermissible and arbitrary use of the AMA *Guides*;" and 4) "a significant number of workers ... who sustain disabling injuries will have less than 15% impairment based on the *Guides*," and

---

**17.** Although *Hector Garcia* is a worker subject to the new Act, he has not suffered a physical injury for which he seeks compensation. The court of appeals nonetheless concluded that Garcia has standing because the new Act will affect his benefits if and when he is injured. 862 S.W.2d at 68. Osvaldo Rivera suffered a compensable injury under the Act, but the court of appeals

held that he was estopped from challenging the Act because he had accepted temporary income benefits. 862 S.W.2d at 69. Texas Legal Services Union Local 2 is a labor union consisting of 75 members employed by Texas Rural Legal Aid. The court of appeals did not analyze the standing of this union separately from that of the Texas AFL–CIO.

thus will be "totally denied access to supplemental income benefits under the Act."

The trial court's specific findings, where relevant, are discussed in the following sections of this opinion. We note at the outset, however, the limited role these findings play in our constitutional review of a legislative enactment. Our approach is as follows:

> In passing upon the constitutionality of a statute, we begin with a presumption of validity. It is to be presumed that the Legislature has not acted unreasonably or arbitrarily; and a mere difference of opinion, where reasonable minds could differ, is not a sufficient basis for striking down legislation as arbitrary or unreasonable. The wisdom or expediency of the law is the Legislature's prerogative, not ours.

*Smith v. Davis*, 426 S.W.2d 827, 831 (Tex. 1968). Regarding factual inquiries, we have articulated this test:

> [Generally,] the constitutionality of a law is not to be determined on a question of fact to be ascertained by the court. If under any possible state of facts an act would be constitutional, the courts are bound to presume such facts exist; and therefore the courts will not make a separate investigation of the facts, or attempt to decide whether the legislature has reached a correct conclusion with respect to them.

*Corsicana Cotton Mills v. Sheppard*, 123 Tex. 352, 71 S.W.2d 247, 250 (1934). *See also Brotherhood of Locomotive Firemen & Enginemen v. Chicago, Rock Island & Pacific R.R.*, 393 U.S. 129, 138–39, 89 S.Ct. 323, 328, 21 L.Ed.2d 289 (1968) ("The District Court's responsibility for making 'findings of fact' certainly does not authorize it to resolve conflicts in the evidence against the legislature's conclusion."); *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) ("A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.").

■ Thus, we agree with the court of appeals that, in most instances, an appellate court must focus on the entire record to determine whether the Legislature has exceeded constitutional limitations. *See* 862 S.W.2d at 73–74. For example, the trial court's finding that the *Guides* lack scientific

validity does not dictate a conclusion that the Legislature has acted arbitrarily or irrationally, if on the record presented it appears that the Legislature could have concluded that the *Guides* are in fact a valid method of measuring impairment. With these principles in mind, we turn to the merits.

## IV

■ We first address the court of appeals' conclusion that the Act violates the open courts doctrine because it is an inadequate substitute for a claimant's common law remedy.

The Texas Constitution provides the following "open courts" guarantee:

> ... All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

Tex. Const. art. I, § 13. This provision includes at least three separate constitutional rights: 1) courts must actually be operating and available; 2) the Legislature cannot impede access to the courts through unreasonable financial barriers; and 3) meaningful remedies must be afforded, "so that the legislature may not abrogate the right to assert a well-established common law cause of action unless the reason for its action outweighs the litigants' constitutional right of redress." *Trinity River Authority v. URS Consultants, Inc.*, 889 S.W.2d 259, 261 (Tex. 1994); *Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 448 (Tex.1993). Plaintiffs' challenges are based on the third guarantee.

The relevant test for this open courts guarantee is as follows:

> [L]egislative action withdrawing common-law remedies for well established common-law causes of action for injuries to one's "lands, goods, person or reputation" is sustained only when it is reasonable in substituting other remedies, or when it is a reasonable exercise of the police power in the interest of the general welfare.

*Trinity River Authority*, 889 S.W.2d at 262 (quoting *Lebohm v. City of Galveston*, 154 Tex. 192, 275 S.W.2d 951, 955 (1955)). *Ac-*

cord Sax v. Votteler, 648 S.W.2d 661, 665 (Tex.1983); Waites v. Sondock, 561 S.W.2d 772, 774 (Tex.1977).

■ In considering the plaintiffs' open courts challenge, we must compare the current statute to the common law remedy, not to the previous statute. The open courts provision guarantees that a common law remedy will not be unreasonably abridged, not that the Legislature will not amend or replace a statute.

To recover damages at common law, an injured worker was required not only to establish that the employer's negligence proximately caused the injury, but also to avoid the defenses of contributory negligence, assumption of the risk, and fellow servant. As previously noted, this combination of hurdles prevented recovery in a large majority of cases. Although the Legislature has softened the defense of contributory negligence by adopting comparative responsibility, see Tex.Civ.Prac. & Rem.Code § 33.001(a), and this Court has abolished the defense of assumption of the risk, see Farley v. MM Cattle Co., 529 S.W.2d 751, 758 (Tex.1975),[18] an injured employee pursuing the common law remedy must still prove that the employer was negligent and that he or she was not more than 50 percent negligent. Although the trial court made no finding on the issue, there was evidence at trial that, even with these changes in the common law, injured employees pursuing negligence claims against their employers recover nothing in a large majority of cases.

■ In comparison, the Act—carrying forward the general scheme of the former act—provides benefits to injured workers without the necessity of proving negligence and without regard to the employer's potential defenses. In exchange, the benefits are more limited than the actual damages recoverable at common law. We believe this quid pro quo, which produces a more limited but more certain recovery, renders the Act an adequate substitute for purposes of the open courts guarantee. See Middleton v. Texas Power & Light Co., 108 Tex. 96, 185 S.W. 556

(1916) (upholding constitutionality of former act). See also Breimhorst v. Beckman, 227 Minn. 409, 35 N.W.2d 719, 735 (1949) ("By the weight of authority, it is recognized that compulsory workmen's compensation acts similar to ours do provide a remedy which is an adequate substitute for the common-law or statutory action for damages for injuries sustained by an employe in his employment.").

Of course, statutory benefits, no matter how certain they are to accrue, could be so inadequate as to run afoul of the open courts doctrine. We do not find that to be the case here, however. As discussed, the Act provides full lifetime medical coverage, temporary benefits replacing a substantial part of lost wages during convalescence, impairment benefits, and long-term wage replacement for those with at least moderately severe impairments. Evidence at trial indicates that the Act, more so than its predecessor, tracks the essential recommendations of the National Commission on State Workmen's Compensation Laws.

In concluding that the Act is an inadequate statutory substitute under the open courts doctrine, the court of appeals focused on its use of "impairment," as measured by the Guides, as a factor in determining income benefits for a permanent injury. It concluded that impairment is not an accurate measure of the economic hardship that a worker will suffer from an injury, as it is a purely objective physical determination made without regard to the claimant's age, experience, training, or occupational demands. In denouncing the statutory reliance on the Guides, the court pointed to the language of the Guides themselves, which state as follows:

Each administrative or legal system that uses permanent impairment as a basis for disability rating needs to define its own process for translating knowledge of a medical condition into an estimate of the degree to which the individual's capacity to meet personal, social, or occupational demands, or to meet statutory or regulatory .

---

18. The Court, relying heavily on the Legislature's rejection of contributory negligence as an absolute bar, concluded that "the reasonableness of an actor's conduct in confronting a risk will be determined under principles of contributory negligence." 529 S.W.2d at 758.

requirements, is limited by the impairment. We encourage each system not to make a "one-to-one" translation of impairment to disability, in essence creating a use of the *Guides* which is not intended.

*Guides* at 6. *See also Report of the National Commission of State Workmen's Compensation Laws* at 38 (concluding that, although impairment plays a proper role in a workers' compensation system, it should not be the primary factor in measuring long-term benefits). The court also relied on the trial court's finding, unchallenged by defendants, that a significant number of workers who sustain disabling injuries will be less than 15 percent impaired under the *Guides*.[19] 862 S.W.2d at 89. The classic example of this is a concert pianist who loses the little finger of one hand. *See Guides* at 2 n. 1. The court further emphasized that the Act's other measures could have been implemented without the 15 percent threshold requirement. 862 S.W.2d at 89. Thus, the court concluded that the 15 percent impairment threshold for supplemental benefits operates to deny these long-term awards to seriously disabled workers.

We believe the court of appeals erred in its constitutional review. It is beyond question that impairment does not directly translate into disability to work. The Act, however, properly defines each of these terms and does not attempt to equate the two. Rather, it allocates income benefits for a permanent injury on a hybrid standard combining both concepts. First, impairment benefits are awarded in direct proportion to the extent of impairment, without regard to the actual wage loss. Second, supplemental income benefits are awarded based on wage loss, if the extent of impairment equals or exceeds 15 percent.[20] Contrary to the reasoning of the court of appeals, there is nothing in the open courts guarantee that requires the Legislature to base compensation benefits solely on wage loss or disability. Although debated among experts, physical impairment is one accepted criteria for measuring benefits, and it was within the Legislature's discretion to utilize this standard. At least twenty-three other states use impairment, as measured by the *Guides* or some similar rating method, in awarding workers' compensation benefits.[21]

Further, we do not believe that the 15 percent threshold violates the open courts provision.[22] The Joint Select Committee, af-

---

**19.** The plaintiffs presented statistical evidence regarding the Florida workers' compensation system indicating that, from 1979 to 1989, a small percentage of the workers receiving benefits for a permanent partial injury had an impairment rating exceeding 15 percent. This evidence, however, does not indicate how many, if any, of those workers receiving an impairment rating of less than 15 percent were disabled from engaging in gainful employment.

**20.** The court of appeals' conclusion that the Act allocates supplemental income benefits "solely on the basis of impairment" is thus incorrect. *See* 862 S.W.2d at 85.

**21.** *See* Alaska Stat. § 23.30.190; Ariz.Rev.Stat. Ann. § 23–1065(C); Ark.Code Ann. § 11–9–522(g); Colo.Rev.Stat.Ann. § 8–42–107(8)(c); Fla.Stat.Ann. § 440.15(3); Ga.Code Ann. § 34–9–1(5); Idaho Code § 72–430(2); Kan.Stat.Ann. § 44–510d(a)(23); Ky.Rev.Stat.Ann. § 342.730(1)(c); La.Rev.Stat.Ann. § 23:1221(4)(q); Me.Rev.Stat.Ann. tit. 39–A, § 153(8); Mass.Gen.L. ch. 152, § 35; Minn.Stat.Ann. § 176.105; Mont.Code Ann. § 39–71–703(3); Nev.Rev.Stat. § 616.605(2); N.H.Rev.Stat.Ann. ·§ 281–A:31–a; N.M.Stat.Ann. § 52–1–24(A); N.D.Cent.Code § 65–01–02(26); Okla.Stat.Ann. tit. 85, § 3(11); R.I.Gen.Laws § 28–33–18(c); S.D.Codified Laws Ann. § 62–1–1.2;

Tenn.Code Ann. § 50–6–241(a)(1); Wyo.Stat. § 27–14–405(g).

**22.** This type of impairment threshold, although not typical, is used in some other jurisdictions. Florida, which appears to be the only state combining impairment income benefits and supplemental income benefits in the same manner as Texas, requires a 20 percent impairment threshold for supplemental income benefits. Fla.Stat. Ann. § 440.15(3)(b). In Maine, permanent-partial awards are based on lost wages, but may extend beyond 260 weeks only if the claimant suffers an impairment greater than 15 percent. Me.Rev.Stat.Ann. tit. 39–A, § 213. Similarly, permanent-partial benefits in Massachusetts extend beyond 260 weeks only if certain specific bodily functions or senses are impaired 75 percent or greater. Mass.Gen.L. ch. 152, § 35. Colorado limits total benefits to $60,000 unless the claimant has an impairment rating greater than 25 percent. Colo.Rev.Stat.Ann. § 8–42–107.5.

Although the remaining states do not utilize any impairment threshold or cutoff, several allocate benefits for a permanent-partial injury in proportion to the extent of impairment, without regard to the amount of actual wage loss. *See* Alaska Stat. § 23.30.190; Colo.Rev.Stat.Ann.

ter criticizing the subjectivity and inconsistency of long-term awards under the former act, recommended basing these benefits in part on physical impairment, a more objective determination. *Report of the Joint Select Committee* at 14.[23] That this objective standard might deny supplemental income benefits to workers suffering a disability does not, without more, render the Act unconstitutional. The issue, rather, is whether the Act's remedy, judged prospectively as a whole, adequately substitutes for the common law negligence remedy. For example, in *Gentile v. Altermatt*, 169 Conn. 267, 363 A.2d 1 (1975), the court was called upon to decide whether, under the Connecticut open courts provision, a no-fault auto insurance statute provided a reasonable alternative remedy to common law negligence. The court approached the issue as follows:

> The question as to whether the legislatively created remedy is a reasonable alternative is best decided by viewing in the aggregate the remedies which the act provides.... Thus, for each remedy or item of damage existing under the prior fault system, it is not required that that item be duplicated under the act but that the bulk of remedies under the act be of such significance that a court is justified in viewing this legislation on the whole as a substi-

tute, the benefits from which are sufficient to tolerate the removal of the prior cause of action.

363 A.2d at 12–15; *see also Bushnell v. Sapp*, 194 Colo. 273, 571 P.2d 1100, 1107 (1977) (determining that a no-fault statutory scheme, *taken as a whole*, was a reasonable substitute for traditional tort remedies).

At common law, a person could be, and many were, severely injured, even up to the point of paralysis or amputation of a limb, and yet recover *nothing*. Workers covered by the Act receive lifetime medical benefits, wage replacement during convalescence, impairment benefits, and long-term wage replacement if they suffer a moderately severe physical impairment. We conclude that these benefits, which are available without regard to the employer's negligence and without reduction for the employee's negligence, adequately replace the common law negligence cause of action. Our duty to enforce the open courts guarantee does not allow us to rewrite legislation merely to try to craft a remedy that we might believe to be more inclusive or equitable. *See Texas State Bd. of Barber Examiners v. Beaumont Barber College*, 454 S.W.2d 729, 732 (Tex.1970) ("It is not the function of the courts to judge the wisdom of a legislative enactment."). Ac-

§ 8–42–107(8) (using impairment with a formula adjustment for age); Nev.Rev.Stat. § 616.605; N.M.Stat.Ann. § 52–1–26 (using impairment with formula adjustments for age, education, and amount of lifting capacity for certain laborers); N.D.Cent.Code § 65–05–12; Okla.Stat.Ann. tit. 85, § 22(3)(a). This approach produces results comparable to those in Texas for impairments under the 15 percent threshold. In Oklahoma and North Dakota, for example, permanent-partial benefits continue for a period equalling the percentage of impairment multiplied by 500 weeks. Thus, a 10 percent impairment produces benefits for 50 weeks, as compared to 30 weeks of impairment income benefits in Texas. *See* Okla.Stat.Ann. tit. 85, § 22(3)(a); N.D.Cent. Code § 65–05–12.

Other states award benefits based on impairment or wage loss, whichever is greater. *See* Ga.Code Ann. § 34–9–263(c)(14) and State Bd. of Workers' Compensation Rule 263; Kan.Stat.Ann. § 44–510e; Ky.Rev.Stat.Ann. § 342.730(1)(c). *See also* Ark.Code Ann. § 11–9–522(b) (allowing Commission to consider, in addition to impairment, "such factors as the employee's age, education, work experience, and other matters reasonably expected to affect his future earning ca-

pacity"); Mont.Code Ann. § 39–71–703 (using impairment with an adjustment for, among other things, wage loss).

**23.** Legislative history confirms the Legislature's desire to produce a more objective system. John Lewis, a workers' compensation expert retained by the Joint Select Committee to evaluate the former system, testified before the Legislative Oversight Committee on Workers' Compensation as follows:

> [W]hat goes on in [the former] system is inherently subjective. The benefit structure that exists particularly for permanent partial is a subjective system. The hope ... is to substitute to a greater degree objectivity so there is less reason to argue, the ability to deliver the benefits much more quickly and without the need for litigation.

Meeting of the Legislative Oversight Committee on Workers' Compensation, April 10, 1989, Tape 4 at 2–3. Senator Glasgow confirmed during Senate Debate that "what we wanted to do is come up with an objective standard for benefits for injured workers." Senate Debate, November 20, 1989, Tape 5 at 18.

cordingly, plaintiffs' open courts claim is overruled.

## V

### A

Plaintiffs also assert an equal protection challenge against the Act's use of impairment. Because impairment does not translate directly into disability, plaintiffs contend that the 15 percent threshold unreasonably and arbitrarily differentiates between those persons meeting the threshold, who are eligible for supplemental income benefits, and those not meeting the threshold, who receive no supplemental benefits.

■ The Texas Constitution guarantees equal protection as follows:

All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services.

Tex. Const. art. I, § 3. Because the 15 percent threshold does not abridge a fundamental right or distinguish between persons on a suspect basis, such as race or national origin, it is valid under section 3 if it is rationally related to a legitimate state purpose. *See Richards v. LULAC*, 868 S.W.2d 306, 310–311 (Tex.1993); *Spring Branch Indep. School Dist. v. Stamos*, 695 S.W.2d 556, 559 (Tex.1985). We conclude that it meets this test.

■ The Joint Select Committee criticized the subjectivity and inconsistency of long-term benefit awards under the former act, recommending a more objective system utilizing impairment along with traditional disability factors. The Legislature accordingly based supplemental benefits on actual lost wages, but with a threshold requirement that the claimant suffer at least a 15 percent impairment. It was not irrational for the Legislature to distinguish between moderately severe impairment likely to interfere with long-term employment from less severe impairment. Setting the threshold at 15 percent is a rational means of accomplishing this purpose. Peter Barth, an economist specializing in compensation issues and former executive director of the National Commission

on State Workmen's Compensation Laws, testified that the 15 percent threshold "culls out those impairments that are not very serious ... [leaving] supplemental income benefits for workers with more serious impairments." That a 15 percent impairment does not perfectly correspond to occupational disability does not render the threshold invalid under the equal protection clause. *See Weinberger v. Salfi*, 422 U.S. 749, 781–85, 95 S.Ct. 2457, 2474–77, 45 L.Ed.2d 522 (1975); *Idaho Dep't of Employment v. Smith*, 434 U.S. 100, 101–02, 98 S.Ct. 327, 328–29, 54 L.Ed.2d 324 (1977); *Board of Ins. Comm'rs v. Great Southern Life Ins. Co.*, 150 Tex. 258, 239 S.W.2d 803, 812 (1951).

The court of appeals also criticized the Legislature's failure to articulate its reasons for setting the threshold at 15 percent, but this does not render the statute invalid. As noted by the United States Supreme Court:

[T]his Court has never insisted that a legislative body articulate its reasons for enacting a statute. This is particularly true where the legislature must necessarily engage in a process of line-drawing. The "task of classifying persons for ... benefits ... inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line." *Mathews v. Diaz*, 426 U.S. 67, 83–84 [96 S.Ct. 1883, 1893, 48 L.Ed.2d 478] (1976), and the fact the line might have been drawn differently at some points is a matter of legislative, rather than judicial, consideration.

*United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980).

### B

■ Under the Act, a claimant is deemed to reach "maximum medical improvement," signaling an end to temporary benefits, no later than two years after those benefits begin to accrue, regardless of whether the claimant's condition has actually stabilized. Tex.Lab. Code §§ 401.011(30), 408.102(a). Plaintiffs contend that this presumption denies equal protection by creating an arbitrary classification. We disagree.

First, it is not apparent that the Act's definition of "maximum medical improvement" creates any classification, as it merely establishes what is in essence a two year cap on temporary income benefits for *all* claimants. Second, even if it could be viewed as creating a cognizable class, it is not irrational. The Legislature could have concluded that some absolute limit on temporary income benefits—which constitute a major benefit under the Act—was a necessary component of an efficient compensation system. Two years is not an arbitrary place to draw the line, as there was medical testimony at trial that most injured workers will actually reach maximum medical recovery within that time period.

Moreover, in those rare situations where the claimant's condition has not stabilized after two years, the presumption will almost always benefit the claimant by inflating the impairment rating. If the claimant is still recovering after two years, the impairment rating, which is determined at maximum medical improvement, will be higher than the actual degree of permanent impairment.

For the foregoing reasons, we conclude that the Act's definition of "maximum medical improvement" does not violate the Texas Constitution's guarantee of equal protection.

## VI

### A

■ Plaintiffs also contend that the Act's use of impairment, as measured by the *Guides*, violates their right to substantive due course of law under the Texas Constitution. This guarantee provides as follows:

No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

Tex. Const. art. I, § 19. Like the federal due process clause, this guarantee contains a substantive as well as a procedural component. *See Eggemeyer v. Eggemeyer,* 554 S.W.2d 137, 140 (Tex.1977).

■ We recently recognized that "Texas courts have not been consistent in articulating a standard of review under the due course clause." *Trinity River Authority,* 889 S.W.2d at 263. Our courts have sometimes indicated that section 19 provides an identical guarantee to its federal due process counterpart. *See Mellinger v. City of Houston,* 68 Tex. 37, 3 S.W. 249, 252–53 (1887); *Lindsay v. Papageorgiou,* 751 S.W.2d 544, 550 (Tex.App.—Houston [1st Dist.] 1988, writ denied); *Texas Optometry Bd. v. Lee Vision Center, Inc.,* 515 S.W.2d 380, 386 (Tex.Civ.App.—Eastland 1974, writ ref'd n.r.e.). Under federal due process, a law that does not affect fundamental rights or interests—such as the economic legislation at issue here—is valid if it merely bears a rational relationship to a legitimate state interest. *See Williamson v. Lee Optical Co.,* 348 U.S. 483, 491, 75 S.Ct. 461, 466, 99 L.Ed. 563 (1955). On other occasions, however, our Court has attempted to articulate our own independent due course standard, *see Eggemeyer v. Eggemeyer,* 554 S.W.2d 137, 140–41 (Tex.1977); *Thompson v. Calvert,* 489 S.W.2d 95, 99 (Tex.1972); *State v. Richards,* 301 S.W.2d 597, 602 (Tex.1957), which some courts have characterized as more rigorous than the federal standard. *E.g.,* 862 S.W.2d at 75; *Yorko v. State,* 681 S.W.2d 633, 636 (Tex.App.—Houston [14th Dist.] 1984), *aff'd,* 690 S.W.2d 260 (Tex.Crim.App.1985). Under any articulation, however, the Act's use of impairment in general and the 15 percent impairment threshold for supplemental income benefits in particular is sufficiently rational and reasonable to meet constitutional due course requirements.

### B

■ Plaintiffs also challenge the accuracy of the *Guides* in measuring impairment. John Gunn, an orthopedic surgeon, testified that the sections dealing with injuries to lower extremities have not been updated to reflect new diagnostic techniques. The *Guides'* editor testified that, although they are complete in terms of organ systems, they do not rate mental trauma or chronic pain. Dr. George Smith, a contributing author to the *Guides,* testified that the rating numbers lack "scientific validity" because they are not based on broad epidemiological studies. The trial court found that "[t]he *Guides* do not

permit percentage impairment ratings for many disabling injuries including mental trauma injuries and chronic pain syndrome," and that "impairment ratings generated from use of the *Guides* have no adequate scientific base."

The *Guides'* editor further testified, however, that the *Guides* are the most reliable method of measuring physical impairment currently available. Dr. Smith also testified that the rating tables are based on "thorough state of the art analysis," and that there is currently no better method for evaluating physical impairment. Tom Mayer, author of the spine section, confirmed that the *Guides* are the "reference of choice" for evaluating impairment. As noted earlier, numerous states use the *Guides* to measure impairment. *See* n. 21, *supra.* On this record, we conclude that the Legislature's adoption of the *Guides* as the basis for determining impairment does not violate substantive due course of law.[24]

Not all impairments, however, are rated under the *Guides. See, e.g., Trindade v. Abbey Road Beef 'N Booze,* 443 So.2d 1007 (Fla.Ct.App. 1st Dist.1983) (knee injury producing instability of the knee, rather than loss of range of motion, received no rating under the *Guides* ). Accordingly, several states using impairment as a basis for benefits do not require strict reliance on the *Guides. See, e.g.,* Alaska Stat. § 23.30.190(b); Ark.Code § 11–9–522(g); Fla.Stat. § 440.15(3)(a); Minn.Stat.Ann. § 176.105(c); N.D.Cent. Code § 65–01–02(26); Okla.Stat.Ann. 85 § 3(11); Tenn. Code Ann. § 50–6–241. Our Act, however, does not allow such flexibility, as it specifically requires all determinations of impairment to be made under the *Guides.* Tex.Lab. Code § 408.124. We express no opinion as to whether the Act might violate due course of law as applied to a claimant suffering from

a permanent physical ailment that is not rated under the *Guides.*

### VII

#### A

We now address the court of appeals' determination that the Act's system of judicial review denies the right to trial by jury.

The Texas Constitution twice guarantees the right to a jury trial:

> The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency....

Tᴇx. Cᴏɴsᴛ. art. I, § 15 (Bill of Rights).

> In the trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right of trial by jury....

Tᴇx. Cᴏɴsᴛ. art. V, § 10 (Judiciary Article).

Article I, section 15 maintains a right to trial by jury for those actions, or analogous actions, tried by jury when the Constitution was adopted in 1876. *Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 450 (Tex.1993). Article V, section 10 protects the right to have a jury resolve fact questions in all "causes" brought in the district courts. *See State v. Credit Bureau of Laredo, Inc.,* 530 S.W.2d 288, 292–93 (Tex.1975); *Tolle v. Tolle,* 101 Tex. 33, 104 S.W. 1049, 1050 (1907). Access to a jury need not be provided at the initial adjudication, so long as "the right to appeal and the jury trial on appeal are secured." *Cockrill v. Cox,* 65 Tex. 669, 674 (1886). In *White v. White,* 108 Tex. 570, 196 S.W. 508 (1917), we held unconstitutional a civil commitment statute that replaced a jury with a commission of physicians:

**24.** The Act specifically requires the Commission to use the " 'Guides to the Evaluation of Permanent Impairment,' third edition, second printing, dated February 1989." Tex.Lab.Code § 408.124(b). At the time of trial, that particular edition was out of print, having been superseded by a more recent edition. Dr. Engleberg, the editor of the *Guides,* testified that although the newer edition may alter some rating numbers, it contained no "major substantive changes." Dr. Engleberg had not studied the newer version in detail at the time of his testimony. Although the Legislature's specification of a particular edition of the *Guides,* now out of print, creates a potential administrative problem, plaintiffs do not contend that it rises yet to the level of a constitutional violation.

A trial by jury means something more than a hearing before a commission such as that prescribed by said act. With us in civil cases it means a due and orderly trial before the statutory number of men, properly qualified for such jury service, impartial, residing within the jurisdiction of the court, drawn and selected according to statute, duly impaneled under the direction of a court of competent jurisdiction, and sworn to render an impartial verdict according to the law and the evidence, the hearing to be in the presence and under the supervision of a court duly authorized and empowered to rule on the evidence, and, except in courts of justices of the peace, to charge on the law of the case, and to set aside the verdict if, in the opinion of the court, it is contrary to the law and the evidence.

196 S.W. at 511–12.

■■■ Although the right to jury trial under the Judiciary article is potentially broader than under the Bill of Rights in that it covers all "causes" regardless of whether a jury was available in 1876, it can also be narrower in that not all adversary proceedings are "causes" within the meaning of the Judiciary Article. *See Credit Bureau,* 530 S.W.2d at 293. One such example is an appeal from an administrative decision. *Id.* (citing *State v. De Silva,* 105 Tex. 95, 145 S.W. 330 (1912), and *Texas Liquor Control Bd. v. Jones,* 112 S.W.2d 227 (Tex.Civ.App.—Houston 1937, no writ)); *see also Texas Ass'n of Business,* 852 S.W.2d at 450–51. The Act's method of judicial review, therefore, does not implicate the right to jury trial under the Judiciary Article.

■■■ We still must determine, however, whether it comports with article I, section 15. The Act is a substitute for the common law negligence remedy, which was an action tried to a jury in 1876. Therefore, at least with regard to the central issues regarding income and death benefits, the Act's remedy is analogous to a claim for which the right to jury trial is constitutionally preserved.

■■■ It is important, however, to distinguish between the procedural right to jury trial and the substantive right to preservation of common law causes of action. Although legislation altering or restricting a cause of action is subject to scrutiny under the open courts doctrine, this substantive change does not implicate the right to jury trial, as long as the relevant issues under the modified cause of action are decided by a jury. *See Middleton v. Texas Power & Light Co.,* 108 Tex. 96, 185 S.W. 556, 562 (1916) (holding that former act did not impair right to jury trial because it authorized "a jury trial of the matters in dispute, *under the law as embodied in the Act* ") (emphasis added). As explained by the Supreme Court of Washington in upholding that state's workers' compensation statute:

> The right of trial by jury accorded by the Constitution, as applied to civil cases, is incident only to causes of action recognized by law. The act here in question takes away the cause of action on the one hand and the ground of defense on the other and merges both in a statutory indemnity fixed and certain. If the power to do away with a cause of action in any case exists at all in the exercise of the police power of the state, then the right of trial by jury is thereafter no longer involved in such cases. The right of jury trial being incidental to the right of action, to destroy the one is to leave the other nothing upon which to operate.

*State v. Clausen,* 65 Wash. 156, 117 P. 1101, 1119 (1911).

■■■ The court of appeals confused these concepts in its jury trial analysis. For example, the court emphasized that in many cases under the Act the jury will be limited to determining physical impairment, "foreclosing any consideration of evidence with respect to the true nature of the worker's disability, loss of earning capacity, or future loss of earnings." 862 S.W.2d at 96. That the Legislature has tied benefits to impairment, however, does not implicate the right to jury trial. The Legislature has now replaced the pre–1913 common law cause of action which based compensation in part on loss of earning capacity with a statutory cause of action which bases compensation in part on impairment. The jury is allowed to determine impairment.

■ Similarly, the court of appeals focused on the "arbitrary presumptive effect of the 15 percent threshold." *Id.* Again, the use of the 15 percent threshold is a substantive part of the benefit scheme. The jury decides whether the claimant is at least 15 percent impaired. There is no denial of trial by jury.

### 1

The Act provides for a trial by jury on the principal compensation issues: compensability of the injury; eligibility for income and death benefits; and, within limits, the amount of those benefits. *See* Tex.Lab.Code § 410.301. The question presented, therefore, is whether the Legislature has so restricted the jury's role in deciding these issues that it has transgressed the inviolate right to jury trial.

■ The Act does specify certain limiting procedures not found in a pure trial de novo. First, the jury is informed of the Commission's decision. Because the jury is not required to accord that decision any particular weight, however, this procedure does not impinge on the jury's discretion in deciding the relevant factual issues. We hold that this procedure does not violate a claimant's right to trial by jury.

■ Second, evidence of the extent of impairment is limited to that presented to the Commission unless the court determines that the claimant's condition has substantially changed. This procedural limitation is akin to those in the rules of civil procedure requiring litigants to disclose witnesses and information at a particular time or be barred from offering that evidence at trial. *See, e.g.,* TEX.R.CIV.P. 215 5. It encourages parties to present relevant evidence during administrative proceedings, thus increasing the accuracy and efficiency of those proceedings. Requiring a party to marshal and disclose evidence diligently does not violate the right to trial by jury.

■ Finally, the jury is required to adopt the specific impairment rating arrived at by one of the physicians in the case. Tex.Lab. Code § 410.306(c). For example, if three doctors testify,[25] respectively opining that the claimant is 10, 14, and 20 percent impaired, the jury must return one of those three numbers as its verdict. It may not consider the entirety of the testimony to find, for example, an impairment rating of 16 percent. We conclude that this restriction also does not impinge on the right to trial by jury. As explained earlier, the right to a jury trial is incident to the underlying substantive cause of action. *See Anderson v. Hodge Boats & Motors,* 814 S.W.2d 894, 896 (Tex.App.— Beaumont 1991, writ denied); *Garza–Vale v. Kwiecien,* 796 S.W.2d 500, 505–06 (Tex. App.—San Antonio 1990, writ denied). It is within the Legislature's power, subject to the guarantees of open courts and due process, to define the parameters of a cause of action; issues of fact not relevant to the cause of action as defined obviously need not be submitted to a jury. Viewed against this principle, section 410.306(c) is valid.

In allocating impairment and supplemental benefits, the Act requires the Commission to assign an impairment rating corresponding to the rating of one of the examining physicians. *See* § 408.125(e). The Act simply does not contemplate or allow any other rating; e.g., one "in between" the physicians' findings. In other words, the requirement that the impairment rating match one of the physicians' findings is part of the substantive statutory scheme. Plaintiffs do not contest the validity of this part of the statute on either open courts or due process grounds.

Section 410.306(c) merely reflects the scope of the Act's remedy. Because the ultimate impairment rating must match one of the doctors' findings, the disputed question of fact on appeal can only be which doctor's rating should prevail. Because that issue is presented to and decided by a jury, the right of trial by jury is preserved. A verdict "in between" the doctor's findings would be irrelevant under the Act's benefit scheme, which does not allow for such an impairment rating.

---

**25.** This presumably would be a typical scenario, with testimony coming from the claimant's physician, the carrier's physician, and the designated doctor. As earlier noted, the opinion of the designated doctor has no presumptive weight at trial on the issue of impairment.

■ The Constitution's guarantee of a jury trial simply does not prohibit altering the manner in which factual questions in a particular cause of action are submitted to the jury. "The preservation of the right to trial by jury does not require that the old forms of practice and procedure be retained. 'So long as the substance of the right to jury trial is maintained, the procedure by which this result is reached is wholly within the discretion of the legislature....'" *Bullard v. State*, 548 S.W.2d 13, 17 (Tex.Crim.App. 1977) (quoting 47 Am.Jur.2d, Jury § 18 p. 641). One could argue, indeed, that any evidentiary restriction not recognized under the common law in 1876 is a limitation on trial by jury, *see, e.g.,* Tex.R.Civ.Evid. 403 (excluding evidence if probative value is substantially outweighed by risk of prejudice or confusion); Tex.Rev.Civ.Stat.Ann. art. 6701d, § 107C(j) (excluding evidence of use or non-use of seatbelts), even though such rules and statutes have never been challenged on jury trial grounds.

The method of submitting questions to juries has also evolved. Originally, juries were allowed to render general verdicts based upon instructions. Because the number of instructions considered helpful to juries accumulated to the point that an "errorless charge became almost impossible." *Lemos v. Montez*, 680 S.W.2d 798, 801 (Tex.1984), the Legislature in 1913 required the use of special issues submitted separately and distinctly. Acts 1913, 33rd Leg., ch. 59, § 1. This special issue system, which undeniably restricted the discretion of the jury in deciding a case, remained in place for sixty years without any question as to its constitutionality.[26]

Like the procedures discussed above, section 410.306(c) alters the mode of submitting the case to the jury without undermining the inviolate right to a jury trial. The jury is allowed to decide the key issue of impairment. The Legislature could have concluded, given the complexity of assessing impairment, that it would promote fairness and efficiency to require the fact finder, whether it be a jury or a Commission hearing officer, to adopt a specific impairment rating supported by one of the experts, rather than attempt to blend testimony to arrive at a new number. This is not such a limitation of the jury's essential role as to render the system unconstitutional.

We recognize that, in many areas, juries have been free to consider conflicting expert testimony on a particular issue and, using its judgment as the finder of fact, blend that testimony to arrive at a proper verdict. In condemnation cases, for example, courts have allowed juries to return a verdict on property value in between the appraisals of the parties' experts. *See, e.g., State v. Angerman*, 664 S.W.2d 794, 797 (Tex.App.—Waco 1984, writ ref'd n.r.e.); *Tenngasco Gas Gathering Co. v. Fischer*, 653 S.W.2d 469, 473 (Tex. App.—Corpus Christi 1983, writ ref'd n.r.e.); *Central Power & Light Co. v. Martinez*, 493 S.W.2d 903, 908 (Tex.Civ.App.—Corpus Christi 1973, no writ). In *Callejo v. Brazos Electric Power Cooperative*, 755 S.W.2d 73, 75 (Tex.1988), a condemnation case, we noted that "jurors are not bound, as a matter of law, to accept the parties' expert testimony." These authorities, however, like all those cited in the concurring and dissenting opinion, assume that the range of answers is not restricted by the substantive law granting the remedy. Compare, on the other hand, the common-law contributory negligence scheme. Jurors were asked at common law only whether the plaintiff and defendant were negligent, producing an all or nothing recovery. The jury was not allowed to answer more "precisely" by assigning negligence percentages to each party, as such answers were simply not then recognized under the substantive law. Similarly, jurors must under the Act choose between the discrete impairment options authorized therein. This is not inconsistent with the right of trial by jury guaranteed by our Bill of Rights.

2

Issues other than compensability of the injury, eligibility for income and death bene-

---

**26.** After it became apparent that the special issue system had also become unworkable, this Court amended Texas Rule of Civil Procedure 277 in 1973 to allow broad form issues, and in 1988 to require broad form issues whenever feasible.

fits, and the amount of those benefits are reviewed without a jury under the substantial evidence test.[27] Tex.Lab.Code § 410.255. Although plaintiffs argue in conclusory fashion that this procedure also violates the right to jury trial, none of the parties have briefed this specific issue. The court of appeals likewise did not separately analyze whether reviewing collateral issues under the substantial evidence test violates the right to trial by jury.

■■■ Judicial review of agency orders under the substantial evidence rule does not per se violate the right to trial by jury. Depending on the particular order being appealed, and the nature and scope of the administrative scheme in general, the judicial review proceeding may not be analogous to an action tried to a jury in 1876, and thus may be exempt from article I, section 15. *See Texas Ass'n of Business*, 852 S.W.2d at 451; *EnRe Corp. v. Texas Railroad Comm'n*, 852 S.W.2d 661, 664–65 (Tex.App.—Austin 1993, no writ). Further, as noted earlier, we have held that appeals in administrative proceedings are not "causes" within the meaning of article V, section 10. *See Credit Bureau*, 530 S.W.2d at 293.

Accordingly, whether substantial evidence review of an agency decision violates the right to jury trial depends on the specific issue being reviewed and how it relates to the overall administrative scheme established by the Legislature. The present case does not involve the actual review of any collateral issues under section 410.255 and the parties have not yet focused on the specific issues that are likely to fall within the ambit of that section. On this record, we decline to hold that section 410.255 is facially unconstitutional. It may encompass issues for which the right to jury trial must be preserved, but that question must wait until it is squarely presented for review.

### B

■■■ As discussed above, the Act provides for modified de novo review of some issues under a preponderance standard, and review

of the remaining issues under the substantial evidence test. The court of appeals held that this constitutes an impermissible "hybrid" system of judicial review. We disagree.

The court of appeals based its decision on *Southwestern Bell Telephone Company v. Public Utility Commission*, 571 S.W.2d 503 (Tex.1978), and *Southern Canal Company v. State Board of Water Engineers*, 318 S.W.2d 619 (Tex.1958). *Southern Canal* involved judicial review of orders of the State Board of Water Engineers. The controlling statute, Tex.Rev.Civ.Stat.Ann. art. 7477, section 13, provided that the *reasonableness* of the Board order should be reviewed in a trial de novo under a preponderance standard, and not under the substantial evidence rule. The Court found this statute to be internally inconsistent because the reasonableness of an administrative order is not a factual question, but rather a legal issue that by definition hinges on whether substantial evidence supports the administrative order. 318 S.W.2d at 623. The reasonableness of a Board decision thus could not be determined as a factual matter under a preponderance standard.

In *Southwestern Bell*, the Court addressed a statute controlling judicial review of Public Utility Commission orders providing as follows:

> Any party to a proceeding before the Commission is entitled to judicial review under the substantial evidence rule. The issue of confiscation shall be determined by a preponderance of the evidence.

Tex.Rev.Civ.Stat.Ann. art. 1446c, § 69. The Court, relying on *Southern Canal*, held that this statute created an invalid "hybrid" system of judicial review because it mixed the substantial evidence and preponderance standards. 571 S.W.2d at 511. Although section 69 arguably did not dictate mixed review of any single issue, we emphasized the general ambiguity regarding the scope and effect of the provision's second sentence. For example, the Court concluded that since "confiscation" is a legal question, "[i]t is, of course, incongruous to speak of deciding as a fact

---

**27.** Presumably, these might include such matters as disputes over medical benefits, attorneys' fees, and administrative sanctions.

from the preponderance of the evidence a question of law." *Id.* Further, even if confiscation could be viewed as a factual issue, it was unclear under the statute whether review was limited to the agency record, and, if not, whether a jury could be demanded. *Id.* This uncertainty led the Court to strike the second sentence only, thus mandating substantial evidence review for all issues.

This case is distinguishable from *Southern Canal* and *Southwestern Bell.* The Act clearly specifies certain factual issues to be reviewed under a preponderance standard, detailing the controlling procedures. The fact finder, although informed of the Commission decision, does not review it for "reasonableness," but rather independently decides the issues by a preponderance of the evidence. Remaining factual issues are reviewed under the substantial evidence test. This approach is neither ambiguous nor internally inconsistent. We therefore conclude that the Act does not establish an impermissible hybrid system of judicial review.[28]

### VIII

Plaintiffs next contend that the Act's method of calculating "average weekly wage" unreasonably discriminates against seasonal employees and those earning less than $8.50 an hour in violation of the equal protection guarantee.

### A

■ A seasonal worker is defined as

an employee who, as a regular course of the employee's conduct, engages in seasonal or cyclical employment that does not continue throughout the entire year.

Tex.Lab.Code § 408.043(d). Average weekly wage—normally based on the thirteen weeks preceding injury—is adjusted for seasonal employees to reflect their cyclical income. For temporary income benefits, the average is determined in the normal manner except that it is "adjusted as often as necessary to reflect the wages the employee could reasonably have expected to earn during the period

that temporary income benefits are paid." *Id.* § 408.043(a).

This adjustment clearly furthers the purpose of temporary income benefits: replacing the income that is actually lost as a result of the disabling injury. Without such adjustment, an injured employee would receive no benefits for an injury occurring at the beginning of the work cycle. Conversely, an injury at the end of the work cycle would entitle the employee to temporary benefits during a period when he or she would have earned no wages. This adjustment is therefore rationally related to a legitimate state purpose, and thus does not violate equal protection.

■ For other benefits payable to a seasonal worker, the average weekly wage is determined by dividing the previous year's income by 50. *Id.* § 408.043(b). This adjustment is also rationally related to the statutory benefit scheme. Without it, benefits would either be artificially high or low depending on the point in the work cycle that the injury occurred.

### B

■ Workers earning $8.50 an hour or more receive temporary benefits equalling 70 percent of their average weekly wage, subject to the statutory maximum and minimum. Tex.Lab.Code § 408.103(a)(1). Although workers earning less than $8.50 an hour receive a higher benefit for the first 26 weeks—75 percent of the average weekly wage—this increased benefit is subject to a second cap not applicable to higher wage earners: the benefit cannot exceed 1/52 of the actual earnings for the previous year. *Id.* § 408.103(b). Plaintiffs contend that this additional cap discriminates against lower paid workers in violation of the equal protection clause. We disagree.

Notably, lower paid workers receive a *higher* percentage of their salary as benefits. The second cap will rarely be relevant, as it applies only if the weekly *benefit* exceeds the previous years's weekly *earnings*. Thus, the cap would not be applicable unless the em-

---

**28.** We disapprove of *Dickerson–Seely & Assoc. v. Texas Employment Comm'n,* 784 S.W.2d 573 (Tex.App.—Austin 1990, no writ), to the extent it is inconsistent with this holding.

ployee's salary increased by approximately 25 percent during the preceding year.

As explained by the court of appeals, the Legislature imposed the second cap because lower paid workers are generally unaffected by the overall statutory cap, which equaled $426 in 1991. *See* 862 S.W.2d at 103 (citing Floor Debate on S.B.1. 71st Leg., 2nd C.S., Tape 1 at 14 (Dec. 12, 1989)). The Legislature apparently concluded that, without the second cap, many lower paid workers would fare better through compensation benefits than they did working, a clear disincentive to recovery and return to work. *Id.* On this record, the cap is rationally related to a legitimate state purpose. We therefore conclude that it does not violate equal protection.

## IX

■ Plaintiffs, without relying on a specific constitutional guarantee, also challenge the "designated doctor" provisions of the Act. Placing presumptive weight on the findings of the designated doctor, according to plaintiffs, arbitrarily subordinates the role of the claimant's regular treating physician.

We conclude that the Act's use of the designated doctor is not invalid. Determining the extent of physical impairment is obviously not an exact science. Evidence at trial indicates that, although the *Guides* increase the consistency and objectivity of impairment diagnoses, there is still a range of findings that might reasonably be reached by competent physicians. The Legislature could have rationally concluded that relying on the opinion of a neutral doctor selected by the Commission or jointly by the parties is the fairest and most efficient means of settling medical disputes at the Commission level. As noted, the designated doctor's opinion regarding impairment has no presumptive weight during judicial review. We accordingly conclude

that the designated doctor provisions do not violate the Texas Constitution.

## X

■ The Act, like its predecessor, allows employees to opt out of the workers' compensation system. Tex.Lab.Code § 406.034. To do so, the employee must notify the employer within five days after beginning employment that the employee desires to retain his or her common law rights. *Id.* § 406.034(b). The court of appeals concluded that this opt out provision violated equal protection and due course of law because it allows new employees hired after the effective date of the Act to avoid its coverage, without affording existing employees a similar opportunity. We disagree.

Plaintiffs do not dispute that, in general, the State has a legitimate interest in requiring employees to make a binding election at the beginning of their employment. This limitation allows carriers to set an appropriate premium and allows employers to budget the cost of compensation insurance and obtain any necessary supplemental liability insurance. The system would be unworkable if employees could freely opt in and out at any time.

The legitimate rationale for limiting the opt out election to new employees continues to apply even when the scope of benefits is modified. The Legislature could have concluded that affording all Texas employees presently covered by workers' compensation a simultaneous opportunity to opt out of that system would cause administrative and budgeting problems. Moreover, because the constitutionality of the Act is not predicated on voluntary participation, the Legislature was not required to afford current employees an opportunity to opt out simply because it changed the scope of benefits.[29] Accordingly, we conclude that section 406.034 does not violate equal protection or due course of law.

29. The Commission argues for the first time in this Court that section 406.034 should be read as allowing such an election. Although the Commission's reading would moot plaintiffs' complaints regarding the opt out provision, we do not believe it is a reasonable construction of the statute. Subsection 406.034(b) expressly requires an election "not later than the fifth day

after the date the employee ... begins the employment." This deadline can only be met by new employees. Moreover, the Commission has never advised employers that existing employees must be afforded an opportunity to opt out, despite the fact that the Act has been in effect over four years.

## XI

█ The court of appeals concluded that the Act, by limiting attorneys' fees, unreasonably restricts a claimant's access to legal representation, in violation of equal protection and due course of law. 862 S.W.2d at 98–100. We disagree.

The Act limits fees for both the claimant's and the insurer's attorneys. Tex.Lab.Code §§ 408.221, 408.222. Both must by approved by the Commission or court, based on several enumerated factors such as time and labor required, difficulty of the questions involved, the fee customarily charged in that locality, and the amount involved in the controversy. *Id.* The only limitation placed solely on the claimant's attorney's fee is that, generally, it may not exceed 25 percent of the claimant's recovery.[30] *Id.* § 408.221(h).

Requiring an attorney to charge a reasonable fee is a valid exercise of the Legislature's police power. The fee limitations under the Act apply to both sides to the controversy, except for the 25 percent cap. This distinction is not irrational, however, as the Legislature could have concluded that injured employees must ultimately be guaranteed at least 75 percent of the benefits provided if they are to maintain the support of themselves and their families.

Nothing in the record establishes that the fee limitations are so egregious that they will result in a claimant being denied needed legal representation. Although there was testimony that some attorneys no longer accept compensation cases under the Act, there was no showing of any claimant who could not obtain counsel. Based on this record, we hold that the fee limitations do not facially violate the guarantee of due course of law or equal protection. *See Department of Labor v. Triplett,* 494 U.S. 715, 721–726, 110 S.Ct. 1428, 1432–1435, 108 L.Ed.2d 701 (1990) (attorneys' fees restrictions in the Black Lung Benefits Act, 30 U.S.C. § 901 et seq., did not violate due process because, even though there was evidence that fewer attorneys were taking such cases, there was no showing that the restrictions actually prevented claimants from obtaining representation).

## XII

Plaintiffs further argue that the Act's adjudicative scheme violates the open courts guarantee and the right to jury trial because it does not allow for resolution of all issues in a single proceeding. According to plaintiffs, issues such as course and scope of employment, entitlement to temporary benefits, and extent of impairment will be decided sequentially, with a separate benefit review conference, contested case hearing, administrative appeal and judicial appeal for each individual issue. They further note that supplemental income benefits are paid on a monthly basis, rather than in a lump sum as under the former act, and are subject to recalculation every quarter.

██ Plaintiffs contend that the burden of pursuing a claim under these circumstances creates an unreasonable financial barrier to court access, facially violating the open courts provision. *See Trinity River Authority,* 889 S.W.2d at 261. We disagree. Assuming that the burden and expense of pursuing litigation may create an "unreasonable financial barrier" within the meaning of the open courts provision, an issue we do not decide, plaintiffs have not demonstrated that the Act, on its face, rises to this level. It is not clear that each compensation issue must be adjudicated separately, as claimed by plaintiffs. Although judicial review under section 410.302 is limited to issues decided by the Commission Appeals Panel, this does not prevent the joinder of issues at the administrative or trial level. On the contrary, the Act appears to contemplate such joinder. *See, e.g.,* § 410.023 (purpose of benefit review conference is to "reach agreement on disputed issues involved in the claim"); § 410.031(b) (benefit review officer must prepare a report including "a statement of each resolved issue" and "a statement of each issue raised but not resolved"). There is simply no way to determine on this record, which does not involve an actual administra-

---

30. The former act limited a claimant's attorney's fee to 25 percent of the recovery, without regard to the specific factors that now must be considered. Tex.Rev.Civ.Stat.Ann. art. 8306, §§ 7c, 7d (repealed).

tive proceeding, that the Act's adjudicatory scheme will have the effect claimed by plaintiffs. We accordingly reject their facial challenge under the open courts provision. Further, that issues may be judicially reviewed sequentially, rather than in a single proceeding, does not implicate the right to trial by jury. *See, e.g., Ex parte Peterson,* 253 U.S. 300, 309, 40 S.Ct. 543, 546, 64 L.Ed. 919 (1950) (preservation of right to jury trial does not prohibit new forms of practice and procedure).

### XIII

■ Plaintiff Texas Legal Services Union contends that section 408.003 of the Act impairs the right to contract guaranteed under article I, section 16 of the Texas Constitution. Section 408.003 provides in relevant part as follows:

(a) After an injury, an employer may:

(1) initiate benefit payments, including medical benefits; or

(2) on the written request or agreement of the employee, supplement income benefits paid by the insurance carrier by an amount that does not exceed the amount computed by subtracting the amount of the income benefit payments from the employee's net preinjury wages.

(b) If the injury is found compensable and an insurance carrier initiates compensation, the insurance carrier shall reimburse the employer for the amount of benefits paid by the employer to which the employee was entitled under this subtitle. . . .

Texas Legal Services Union, which represents the employees of Texas Rural Legal Aid, has in place a collective bargaining agreement requiring TRLA to provide supplemental disability insurance equal to "the difference between worker's compensation benefits and two-thirds (2/3rds) of the employee's weekly salary up to a maximum of Two Hundred Dollars ($200.00) per week." This supplemental benefit appears to be within the range allowed under section 408.003, and the union does not explain how its collective bargaining agreement has been

restricted. On this record, we conclude that section 408.003 is not a facially invalid impairment of the obligation of contract. We need not reach the hypothetical question of whether section 408.003 would operate unconstitutionally if an employer desired to supplement benefits in excess of the employee's net preinjury wages.

### XIV

Defendants contend that the trial court erroneously excluded the "Tillinghast Study," an actuarial report comparing costs and benefits under the present and former compensation systems. Because we uphold the Act's benefit system without regard to this study, we need not reach the issue of whether it was erroneously excluded. Defendants also complain that the trial court excluded the testimony of William Powers, a professor at the University of Texas School of Law, who planned to testify regarding Texas constitutional and common law. Under the circumstances of this case, error in this regard, if any, was harmless. *See* Tex.R.App.P. 184(b).

For the foregoing reasons, we reverse the judgment of the court of appeals and render judgment upholding the validity of the Act against plaintiffs' constitutional challenges.

SPECTOR, Justice, joined by HIGHTOWER and GAMMAGE, Justices, concurring and dissenting.

Texans have long recognized that the right of trial by jury is "the only safe guarantee for the life, liberty, and property of the citizen." [1] Today's decision undermines that guarantee by allowing the Legislature to arbitrarily curtail the jury's role. While I join in most parts of the majority opinion, I cannot join in part VII, which abridges an injured worker's right to a jury trial.

The Texas Workers' Compensation Act of 1989 sharply restricts the jury's discretion on critical issues. In determining the extent of impairment, the jury must adopt one of the exact impairment ratings offered by a physician in the case. TEX.LAB.CODE § 410.306(c).

---

1. THE DECLARATION OF INDEPENDENCE OF THE REPUBLIC OF TEXAS (1836), *reprinted in* 3 TEX. CONST. ANN. 478, 479 (Vernon 1993).

Thus, the jury cannot choose to accept only part of a physician's testimony; it must adopt that testimony in full, without regard to the physician's credibility or the jury's own assessment of the underlying facts.

I believe this requirement violates our Constitution. *See* TEX. CONST. art. I, § 15; TEX. CONST. art. V, § 10. The right of trial by jury dictates that a jury must be allowed to decide all matters of fact, and the essence of the jury's role as fact-finder is to weigh and evaluate the evidence. A jury cannot be bound, as a matter of law, to accept expert testimony. *See Callejo v. Brazos Elec. Power Coop., Inc.*, 755 S.W.2d 73, 75 (Tex.1988). Rather, "[t]he jury is the exclusive judge of the facts proved, the credibility of the witnesses and the weight to be given to their testimony." *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792, 796 (1951).

We have expressly recognized that the fact-finder is entitled to accept one portion of an expert's testimony, while rejecting another. *Hood v. Texas Indem. Ins. Co.*, 146 Tex. 522, 209 S.W.2d 345, 346 (1948). This principle is firmly embedded in our jurisprudence. *See Texas & P. Ry. Co. v. Brown*, 142 Tex. 385, 181 S.W.2d 68, 72 (1944) ("[A] jury may accept or reject portions of the testimony of a witness . . . ."); *Houston Belt & Terminal Ry. Co. v. Vogel*, 179 S.W. 268, 269 (Tex.Civ.App.—Galveston 1915, writ ref'd) ("The jury were not compelled to credit all the testimony of any witness or reject it all . . . ."); *Houston & T.C.R. Co. v. Taylor*, 20 Tex.Civ. App. 654, 49 S.W. 1055, 1055 (Tex.Civ.App. 1899, writ ref'd) ("The jury were not compelled to credit all the testimony of any witness or reject it all."); *Garcia v. Sanders*, 90 Tex. 103, 37 S.W. 314, 317 (1896) ("The jury were not bound to accept or reject in toto the testimony of either [witness] . . . ."); *Garcia v. State*, 522 S.W.2d 203, 206 (Tex. Crim.App.1975) (jury may "accept or reject any or all of the [witnesses'] testimony"); *Austin Fire Ins. Co. v. Adams–Childers Co.*, 246 S.W. 365, 368 (Tex.Comm'n App.1923, judgm't adopted) ("The jury had a right to believe part of [a witness'] evidence and absolutely discard other portions of it."); *New York Underwriters Ins. Co. v. Upshaw*, 560 S.W.2d 433, 434 (Tex.Civ.App.—Beaumont 1977, no writ) ("[T]he jury had the sole right to accept or reject the testimony of each witness in whole or in part."); *Langdeau v. Piske*, 317 S.W.2d 806, 809 (Tex.Civ.App.— Austin 1958, writ ref'd n.r.e.) ("[I]t is peculiarly within the province of the jury to reconcile inconsistencies or accept or reject portions of witnesses' testimony."); *Texlan, Inc. v. Freestone County*, 282 S.W.2d 283, 288–89 (Tex.Civ.App.—Waco 1955, no writ) ("[T]he jury, being the trier of the facts, had the duty and responsibility of passing upon the credibility of the witnesses and determining the ultimate issues before them and, in so doing, they could reject or accept the testimony of each witness in whole or in part as they found the facts to be.").

These authorities establish that the jury is entitled to weigh a physician's testimony and accept it in whole *or in part*. This role is especially important in determining an injured worker's impairment rating. Even the American Medical Association, which promulgated the guides that provide the ratings, insists that an impairment rating "was by no means intended as a precise indicator of impairment." [2] The record establishes that a three percentage point difference in the ratings would not be unexpected, even when two physicians agree on the extent of impairment. Under the Act, three percentage points means nine weeks of impairment income benefits. Three percentage points could also determine whether an injured worker receives any supplemental income benefits at all, since those benefits are not available to anyone with an impairment rating below fifteen percent.

The Act provides that unless there has been a substantial change in the worker's condition, "evidence of extent of impairment shall be limited to that presented to the commission." TEX.LAB.CODE § 410.306(c). Thus, the jury is bound by a physician's initial conclusion, even if the physician backs off from that conclusion at trial, or admits that the impairment rating was rounded to the nearest five percent, as the guides expressly allow.

2. Brief of Amici Curiae American Medical Association et al. at 9.

Requiring the jury to adopt fully the testimony of one of the experts, and reject fully the testimony of the others, eviscerates its central function of weighing and evaluating the testimony. Because this derogation of the jury's historic role unconstitutionally impinges on the right of trial by jury, I dissent.