# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-05-00454-CV

**Cecelia Ledesma, Appellant**

**v.**

**George L. Shashoua, M.D.; Oakwood Women's Cenre, P.A. at Round Rock;
Joseph Eddings; B. Johns, CRNA; and Round Rock Medical Center, Appellees**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 277TH JUDICIAL DISTRICT
NO. 05-489-C277, HONORABLE KEN ANDERSON, JUDGE PRESIDING**

### M E M O R A N D U M   O P I N I O N

Cecelia Ledesma appeals the district court's dismissal of her health care liability claim against Certified Registered Nurse Anesthetist, Bruce Johns, for failure to make an objective, good faith effort to timely serve an expert report that complies with the requirements in section 74.351 of the civil practices and remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West Supp. 2006). Ledesma argues that the district court erred in holding that the expert reports that she had served failed to comply with section 74.351 and by not allowing her a 30-day time extension to cure any deficiencies. Ledesma also asserts that chapter 74 of the civil practice and remedies code is unconstitutional. We affirm the district court's judgment.

### BACKGROUND

In November 2001, Ledesma underwent surgery at Round Rock Medical Center to remove her right ovary and her appendix. She filed this lawsuit on January 14, 2004, against the

hospital, her surgeon, his professional association, the anesthesiologist, and Johns, the certified registered nurse anesthetist, alleging in part that she suffered permanent injury to her left arm, hand, and wrist as a result of incorrect placement of the IV in her left forearm and improper placement and monitoring of her arm during the surgery.[1]

On May 14, 2004, Ledesma served Johns's counsel with four expert reports that purported to comply with the requirements of section 74.351(a). *See id*. § 74.351(a) ("In a health care liability claim, a claimant shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert reports . . . for each physician or health care provider against whom a liability claim is asserted."). The reports were prepared by the following experts: (1) Dr. Dinner, a board certified anesthesiologist; (2) Dr. Hamilton, a board certified obstetrician/gynecologist; (3) Stephanie Tate, a certified operating room nurse and certified legal nurse consultant; and (4) Thomas Sharon, a registered nurse certified in intravenous therapy.

On June 4, 2004, after Ledesma's 120-day deadline for serving her expert reports expired, Johns filed a motion to dismiss and sever the claims against him on the grounds that the expert reports did not satisfy the requirements of section 74.351. *See id*. § 74.351 (a)-(b), (*l*), (r)(6). In her response to the motion to dismiss, Ledesma asserted that the reports were adequate and alternatively, she asked the court to grant her a 30-day extension to cure any deficiencies. *See id*. § 74.351(c) ("If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the

---

[1] Ledesma also alleged that the surgery was unnecessary and the result of a misdiagnosis of her abdominal pain. These claims do not pertain to Johns.

claimant in order to cure the deficiency."). The district court granted Johns's motion to dismiss (but not his motion to sever) and dismissed all of Ledesma's claims against Johns. Johns subsequently filed a second motion to sever, which the district court granted, making the dismissal order regarding Johns final. Ledesma appeals from the orders dismissing and severing her claims against Johns.

## DISCUSSION

**Adequacy of the expert reports**

In her first issue, Ledesma asserts that the district court erred in holding that the expert reports that she served failed to comply with section 74.351's requirements. The expert report or reports required under section 74.351(a) must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). A trial court must "grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply" with this definition of an expert report. *Id.* § 74.351(*l*).

To constitute a "good faith effort" the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question; and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 49, 52 (Tex. 2002); *American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). Although an expert report "need not marshal all the plaintiff's proof," it must include the expert's opinion on each of the elements

3

identified in section 74.351. *Palacios*, 46 S.W.3d at 878. It is not enough for the report merely to state the expert's conclusions about the statutory elements. *Id*. at 869. "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Bowie Mem'l Hosp.*, 79 S.W.3d at 52 (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)).

Because the statute dictates what is required in the report, the only information relevant to determining whether a report complies with the statute is that within "the four corners" of the report. *Palacios*, 46 S.W.3d at 878. This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *Bowie Mem'l Hosp.*, 79 S.W.3d at 53.

We review a trial court's decision to dismiss a health care liability claim under section 74.351 for an abuse of discretion. *Palacios*, 46 S.W.3d at 875. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985). A clear failure by the trial court to analyze or apply the law correctly also constitutes an abuse of discretion. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

With these principles in mind, we review the four expert reports that Ledesma furnished in connection with her suit.

### Dr. Dinner's report

Dr. Dinner, a board certified anesthesiologist, begins his report by recounting his qualifications and professional experience and states "By virtue of my training in anesthesiology, . . . as well as 20 years of experience in the operating room, I am very familiar with the

4

circumstances and standards of care relevant to the proceedings in this case." He then summarizes Ledesma's medical history and describes the injuries that appeared after her November 2001 surgery. He notes that, while in the post anesthesia care unit, Ledesma "complained of numbness and discomfort in her left wrist" that was later diagnosed as "a radial nerve palsy."

Dr. Dinner then concludes:

> By virtue of the fact that Ms. Ledesma had no previous complaints of left arm pain or paresthesia on 11/01/01 yet left the hospital with a significant injury to that extremity, it is without question that this damage was sustained during the course of her perioperative period. It is my position that the injury could only have occurred as a consequence of improper and traumatic placement and inappropriate positioning and/or restraining of the extremity.

Dr. Dinner observes that Ledesma complained about "significant pain at the intravenous site" upon initiation of the intravenous line. He notes:

> The individual who placed the line has the responsibility to do so in a manner which will not cause trauma to the surrounding tissues. A portion of the superficial branch of the radial nerve runs through the location where the intravenous line was placed and as such, was "speared" by the sharp stylet that serves as an introducer for the angiocath. This mechanism of injury is fully consistent with the post operative diagnosis of tenosynovitis and myositis and the MRI findings point to injury in the area of the corresponding muscle. Customarily, the individual who places the intravenous line is identified in the medical record and places a note at the time positioned. No such note is in the chart. . . . It was essential that the clinician performing this procedure possess the necessary skill to carry this out properly. This was not the case in this situation and the individual who established the iv access was negligent in the performance of their duties by causing severe trauma to the branch of the radial nerve in that location. Had the individual who started the intravenous line acted in a more cautious, skillful and appropriate manner in keeping with the standard of care, it is more likely than not that the injury that Ms. Ledesma sustained would not have occurred.

5

Dr. Dinner next addresses the actions of the anesthesia team:

I have also carefully reviewed the actions of the anesthesia team in this case from the preoperative assessment all the way through to the post operative recovery course[.] The patient was in the lithotomy position with her legs restrained in stirrups and both arms placed on arm boards at acute angles to the body axis. The anesthesia team consisting of Dr. Joseph Eddings and Bruce Johns CRNA together with the nurses including but not limited to the circulating nurse and scrub nurse as well as the surgeon, Dr. Shashoua, had a duty to ensure the safety of the padding, restraint, placement, and positioning of the patients arms armboard, and restraints prior to and during the procedure. Every health care provider in the surgical suite owed a duty of care to Ms. Ledesma to ensure her safety during the procedure due to the administration of the anesthesia, which would prevent the patient from protecting herself with protective reflexes. The healthcare provider placing the restraints failed to document the manner in which the patients extremities were restrained or placed on the board. The standard of care requires such documentation in the patient's records. Therefore there was a violation in the standard of care with respect to documentation. The injury is consistent with improper placement, bad positioning, inattentive application of pressure on the patient's arm during the procedure, or restraints being placed too tightly and restricting the blood flow in this area. It would violate the standard of care for any healthcare provider in the surgical suite to fail to notice, address, and document any such occurrence.

Dr. Dinner concludes:

Based upon reasonable medical probability, this injury occurred due to improper IV placement, poor technique in IV placement, or improper placement, bad positioning, inattentive application of pressure on the arm, or restraints being improperly placed so that they we[r]e too constrictive. The occurrence of any one or more of these events would violate the standard of care for patient safety during anesthesia. Dr. Joseph Eddings as the anesthesiologist, Bruce Johns, CRNA, the surgeon, Dr. Shashoua, and the nurses and employees of Round Rock Medical Center owed a duty of care to Ms. Ledesma for patient safety in the above regard during anesthesia. The radial nerve palsy would not have occurred but for the negligence and violations of the standard of care applicable to each of these healthcare providers.

### Dr. Hamilton's report

Ledesma's second expert report was prepared by Dr. Hamilton, a board certified obstetrician and gynecologist. Most of Dr. Hamilton's report focuses on Ledesma's allegations that her obstetrician, Dr. Shashoua, misdiagnosed the cause of her abdominal pain and performed unnecessary surgeries. Dr. Hamilton opines that:

> [Dr. Shashoua] and Dr. Wexler, the surgeon who performed the appendectomy, were negligent in not insuring proper positioning of the patient on the operating table. It was their negligence along with that of Dr. Joseph Eddings MD, the anesthesiologist, and Bruce Johns, Certified Registered Nurse Anesthetist, that produced a severe inexcusable injury to the radial nerve in Mrs. Ledesma's left arm.

### Nurse Sharon's report

Ledesma's third expert report was prepared by Thomas Sharon, a registered nurse licensed to practice in Florida. Nurse Sharon describes his qualifications as follows:

> During the past twenty-five years, I have worked as a staff nurse, nursing supervisor, nursing educator in various hospitals and as a chief executive officer of a corporate provider of nursing services. . . .
>
> I am experienced and familiar with the standard of care ordinarily exercised by nurses in hospitals. I am specifically experienced and familiar with the degree and skill of care exercised by nurses in hospital operating suites or free standing surgical centers with regard to the duties and responsibilities of the circulating nurse during the intraoperative phase of surgery.

Nurse Sharon then lists the medical records and reports he reviewed and states:

> [I]t is my opinion with a reasonable degree of professional certainty that the circulating nurse on duty in the operating room departed from good and accepted standards of nursing practice in failing to prevent prolonged pressure against the left radial nerve plexus during surgery.

7

The circulating nurse owed a duty to the patient to check the patient's body position, body alignment and application of positioning devices such as arm boards to assure that bony prominences and nerve bundles are not pressurized during surgery.

*　　*　　*

It should be noted that use of the arm board was part of the plan to prevent injury related to surgical intervention. When using the arm boards the circulating nurse or anesthetist usually wraps adhesive tape around the upper and lower arm and under the arm board in order to keep it in place. During the surgery, the circulating nurse must frequently check the t[a]pe to make certain that it is not too tight. The tape must never be applied around the wrist or elbow joints and these are the two places most susceptible to nerve damage if the tape is applied too tightly or becomes tighter later on due to peripheral edema (swelling). Therefore it is my opinion with a reasonable degree of professional certainty that the improper application of the arm board and failure to check the left upper extremity were the proximate cause of the radial palsy of the left wrist and hand.

*　　*　　*

It is my opinion with a reasonable degree of professional certainty that the radial nerve compression injury was caused by taping the left wrist to the arm board so as to cause compression entrapment of the radial nerve plexus. The circumferential taping of the wrist to an arm board is contraindicated because of the proximity of the radial nerve near the skin surface. Even if another staff member taped the wrist, it was incumbent upon the circulating nurse to insist that the tape be removed from the wrist and that the arm board be secured by taping over the mid forearm or the hand (if the wrist needed to be immobilized). Furthermore, the circulating nurse also owed a duty to the patient to check the hand and wrist at frequent intervals to make certain that the circumferential tape was not causing pressure and was not interfering with peripheral blood flow.

### Nurse Tate's report

Ledesma's fourth expert report was prepared by Stephanie Tate, an operating room nurse clinician and legal nurse consultant. Nurse Tate explains her qualifications as follows:

I am currently licensed to practice Registered Nursing in the state of California. . . . I have been practicing operating room nursing since 1981, and I scrub and circulate all specialties including trauma. I am familiar with the standards of care relevant to the facts of this case.

8

Nurse Tate then discusses the standard of care that the circulating nurses owed to Ledesma with respect to the placement of the IV:

> Each circulating RN had a responsibility to actively advocate for Ms. Ledesma. Whichever one brought her to the room had the responsibility to conduct a pre-op assessment and interview, document and address any concerns Ms. Ledesma verbalized about pain at her IV site, document her assessment of the IV site and what interventions were undertaken to troubleshoot the problem as well as provide pain relief and document to whose attention the matter was directed. None of this was done, in spite of the fact the fact that Ms. Ledesma is adamant that she complained about pain at her IV site as soon as it was started. This is in violation of basic nursing fundamentals, AORN [Association of Perioperative Registered Nurses] Recommended Principals and Practices, and ANA [American Nurses Association] Standards. . . .

Nurse Tate next discusses the standard of care that circulating nurses owe with respect to the positioning of the patient during surgery:

> The circulating nurses also had professional responsibilities involving patient positioning and patient safety, according to AORN. I have attached the 2001 AORN Standards of Care addressing the perioperative nurse's responsibility in patient positioning. I will quote an excerpt from the standard here:
>
> **Standard of Care (per AORN:)**
> The circulating RN (perioperative nurse) is the surgical patient's advocate, and is responsible for ensuring patient safety while under his or her care. The perioperative nurse should actively participate in safety and appropriately positioning the patient, continuously monitoring body alignment and tissue integrity based on sound physiologic principals, and communicating specific patient needs to the rest of the surgical team.
>
> *    *    *
>
> Once the surgical team is scrubbed in, it is an ongoing responsibility of both the circulating RN (or RNs) and anesthesia to continually check—and document—the patient's extremities and potential pressure points after changes in positioning.

Although anesthesia documented "all pressure points checked and padded" at the beginning of the procedure, it is likely that her position was changed after intubation, perhaps more than once. The documentation concerning positioning on the part of the circulating RNs is minimal; in fact it is limited to the anatomical diagram of the patient, and is unclear. The perioperative (circulating) RN's responsibilities include documenting both the positioning and type of padding used intraoperatively, as well.

The fact that the anesthesia provider documented "all pressure points checked and padded" does not exempt the circulating RN from his or her own responsibility for accurate and thorough documentation. The type of padding use, and the specific sites where it was placed, should have been documented in the intraoperative nursing notes. The fact that it is not documented is in violation of 2001 AORN standards of care addressing the perioperative (circulating) RN's responsibility in documenting perioperative nursing care, as well as the ANA Code for Nurses with Interpretive Statements, with Explications for Perioperative Nursing. This states, in part, that the perioperative (circulating) RN is required to "Complete operative records accurately and in an objective and non-judgmental manner" and "Maintain records in an orderly manner."

\*     \*     \*

This continuous lack of nursing documentation in the medical record violates the standard of care and resulted in harm to the patient. The complaint of pain should have been addressed and reported to the surgeon and the anesthesiologist before the start of the surgery to rule out IV access as the cause of this injury. Also, in 2001, nurses were required by JCAHO (and still are) to assess and document patients' complaints of pain on a scale of 1 to 10—10 being the most severe. This was not done and violates the standard of care for pain assessment.

*Analysis*

We conclude that the district court did not abuse its discretion in holding that these four expert reports did not satisfy the requirements of section 74.351 with respect to Johns. The expert reports prepared by Nurse Tate and Nurse Sharon are inadequate because they fail to identify Johns at all. Both nurse reports address generally the standard of care applicable to registered nurses or circulating nurses, of which Johns is neither. "We have held that where the identity of a defendant

10

is not explicitly mentioned within the 'four corners' of the report, the report is, for that reason alone, deficient as to that defendant because it would require the reader to infer or make an educated guess as to whose actions the expert is complaining." *Bogar v. Esparza*, ___ S.W.3d ___, ___ No. 03-07-00037-CV, 2007 Tex. App. LEXIS 5088, at *19 (Tex. App.—Austin June 28, 2007, no pet. h.) (citing *Austin Heart, P.A. v. Webb*, ___ S.W.3d ___, ___; No. 03-06-00607-CV, 2007 Tex. App. LEXIS 3600, at *15 (Tex. App.—Austin May 9, 2007, no pet. h.); *Apodaca v. Russo*, ___ S.W.3d ___, ___ No. 03-06-00258-CV, 2007 Tex. App. LEXIS 3467, at *13 (Tex. App.—Austin May 2, 2007, no pet. h.)). Furthermore, the nurse reports are inadequate to satisfy the causation element of section 74.351(r)(6) because only a qualified physician can render expert opinion testimony regarding the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in a health care liability claim. *See* Tex. Civ. Prac. & Rem. Code. Ann. § 74.351(r)(5)(C).

The two expert reports that do mention Johns—Dr. Dinner's report and Dr. Hamilton's report—do not sufficiently identify the standard of care applicable to Johns or explain how Johns breached that standard. Dr. Dinner's report broadly states that the entire surgical team including Johns "had a duty to ensure the safety of the padding, restraint, placement, and positioning of the patients arms armboard, and restraints prior to and during the procedure" and that "[e]very health care provider in the surgical suite owed a duty of care to Ms. Ledesma to ensure her safety during the procedure," but Dr. Dinner does not explain what Johns, as the CRNA, should have done differently to provide for Ledesma's safety. *See Palacios,* 46 S.W.3d at 879-80 (conclusory statement that "precautions to prevent [patient's] fall were not properly utilized" did not sufficiently apprise physician whether expert believed that the standard of care required him "to have monitored

11

[the patient] more closely, restrained him more securely, or done something else entirely"). Likewise, the statements in Dr. Hamilton's report that Dr. Shashoua and Dr. Wexler "were negligent in not insuring proper positioning of the patient on the operating table" and that "[i]t was their negligence along with that of Dr. Joseph Eddings MD, the anesthesiologist, and Bruce Johns, Certified Registered Nurse Anesthetist, that produced a severe inexcusable injury to the radial nerve in Mrs. Ledesma's left arm" do not identify the standard of care applicable to Johns. *See id.* at 880 (statement that restraints to prevent fall were not properly used is not a statement of the standard of care).

Having reviewed the four expert reports, we conclude that the district court could have reasonably concluded that the reports do not represent an objective good faith effort to comply with the definition of an expert report in section 74.351(r)(6).

**Extension of time under 74.351(c)**

Ledesma also argues that the trial court erred by not granting her request for a 30-day extension of time to cure any deficiencies in her expert reports. Section 74.351(c) states that if elements of an expert report are found to be deficient, "the court may grant one 30-day extension to the claimant in order to cure the deficiency." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c). The extension allowed under 74.351(c) is discretionary, not mandatory. *See Bogar,* ___ S.W.3d at ___, 2007 Tex. App. LEXIS 5088, at *9; *Austin Heart,* ___ S.W.3d at ___, 2007 Tex. App. LEXIS 3600, at *19-20. Nothing in the record indicates that the district court acted arbitrarily or unreasonably in exercising its discretion not to allow Ledesma a 30-day extension to cure the deficiencies in her report. We overrule Ledesma's second issue.

**Constitutional challenges to chapter 74**

Ledesma argues that chapter 74 is unconstitutional, citing summarily to the due process and equal protection guarantees of the federal and state constitutions, as well as the open courts provisions of the Texas Constitution. *See* U.S. Const. amend. XIV; Tex. Const. art. I, § 13. She contends that the requirements of chapter 74, particularly the expert report requirement in section 75.351 and the restriction on the application of the doctrine of res ipsa loquitur in section 74.201 constitute arbitrary and unreasonable restrictions on her claim.

When reviewing the constitutionality of a statute, we begin with a presumption that it is constitutional. *Walker v. Gutierrez*, 111 S.W.3d 56, 66, (Tex. 2003); *see also* Tex. Gov't Code Ann. § 311.021(1) (West 2005). The wisdom or expediency of the law is the legislature's prerogative, not ours. *Texas Workers Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 520 (Tex. 1995). The party challenging a statute's constitutionality has the burden of proving that the statute fails to meet constitutional requirements. *Walker*, 111 S.W.3d at 66.

In challenging the constitutionality of a statute, a party may show that the statute is unconstitutional on its face or as applied to that party. *Garcia*, 893 S.W.2d at 518 n.16; *see also City of Corpus Christi v. Public Util. Comm'n of Tex.*, 51 S.W.3d 231, 240-41, (Tex. 2001) (Owen, J., concurring). To sustain a facial challenge, the party must show that the statute, by its terms, always operates unconstitutionally. *Id.* To sustain an "as applied" challenge, the party must show that the statute is unconstitutional when applied to that particular person or set of facts. *Id.*

Here, Ledesma did not cite any authority or make any argument that would support a facial challenge to the constitutionality of chapter 74. She merely asserts that the restrictions section 74.351 imposes on claimants are "unreasonable and/or arbitrary." Because Ledesma failed

to demonstrate that chapter 74 always operates unconstitutionally, her challenge to the statute as facially unconstitutional is not persuasive.

Ledesma did challenge the constitutionality of section 74.351, as applied to her, asserting that the requirements of section 74.351 constitute an arbitrary and unreasonable restriction on her claim in violation of her constitutional rights to equal protection, due process, and open courts. With regard to Ledesma's due process challenge, the supreme court has held that the dismissal of a suit due to a claimant's failure to file a compliant expert report does not violate due process guarantees, even in the absence of notice of the report's noncompliance before the motion to dismiss. *Walker*, 111 S.W.3d at 66 (applying former article 4590i). The court reasoned that due process does not require "prior notice that the law is serious about a clearly stated consequence." *Id.*

Ledesma's open courts argument is equally misguided. A claimant who brings an open courts challenge has the burden of showing that the expert-report requirements actually prevented her from pursuing her claims. *McGlothlin v. Cullington*, 989 S.W.2d 449, 453 (Tex. App.—Austin 1999, pet. denied). The open courts provision is premised upon the rationale that the legislature has no power to make a remedy by due course of law contingent upon an "impossible condition." *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 355 (Tex. 1990). Ledesma has not proven how the provisions of the section 74.351 itself, as opposed to her own failure to provide an adequate report, prevented her from pursing her claim against Johns. *See Marquez v. Providence Mem'l Hosp.*, 57 S.W.3d 585, 595 (Tex. App.—El Paso 2001, pet. denied).

14

**CONCLUSION**

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed:   August 3, 2007