# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00196-CV

**Michelle Bubnis, Appellant**

**v.**

**Leander Independent School District, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
### NO. D-1-GV-09-001868, HONORABLE TIM SULAK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an appeal from a district court judgment in a suit for judicial review of a final administrative order in a dispute under the Workers' Compensation Act.[1] The dispute, which pits a self-insured governmental entity, Leander Independent School District (LISD),[2] against one of its former employees, Michelle Bubnis, centers on whether a compensable injury incurred by Bubnis in 2003 extended to her subsequent diagnoses of anxiety and depression and the validity of a 30% impairment rating predicated on those diagnoses. Although Bubnis prevailed before the Texas Department of Insurance Division of Workers' Compensation (DWC), LISD won at trial, obtaining a jury finding that Bubnis's compensable injury did not extend to anxiety or depression. Based on the jury's findings, the district court rendered judgment reversing the administrative order,

---

[1] *See generally* Tex. Lab. Code §§ 401.001–419.007 (Workers' Compensation Act).

[2] As a self-insured governmental entity under the Act, LISD pays claims as if it was a workers' compensation insurance carrier. *See id*. §§ 407.001–.133 ("Self-Insurance Regulation").

declaring that the Bubnis's compensable injury did not extend to anxiety or depression, and assigning a final impairment rating of 0% regarding that injury.

On appeal, Bubnis challenges the sufficiency of the evidence supporting the jury's extent-of-injury finding and the district court's judgment imposing a 0% rather than 30% impairment rating. For the reasons we explain below, we will affirm the district court's judgment.

**BACKGROUND**

Under the Workers' Compensation Act, a worker who sustains a "compensable injury"—i.e, "an injury that arises out of and in the course and scope of employment"[3]—is entitled to benefits that include, of relevance here, "medical benefits" payable from the date of injury[4] and "impairment" income benefits to compensate for permanent loss resulting from the compensable injury.[5] The Act prescribes intricate procedures governing the reporting, claiming, and paying of workers' compensation benefits by injured workers, employers, and workers' compensation insurance carriers.[6] And when disputes arise within this regime, the Act likewise provides administrative resolution mechanisms within the DWC, beginning with an informal, non-adversarial

---

[3] *See id*. § 401.011(10) (defining "compensable injury").

[4] *See id.* § 408.021(a) ("An employee who sustains a compensable injury is entitled to all health care reasonably required by the nature of the injury as and when needed."); *see generally id.* §§ 408.021–.032 (medical benefits).

[5] *See id.* §§ 401.011(23) (defining "impairment" as "any anatomic or functional abnormality or loss existing after maximum medical improvement that results from a compensable injury and is reasonably presumed to be permanent"), 408.121–.129 (impairment income benefits).

[6] *See generally id.* §§ 409.001–.024 (compensation procedures).

"benefits review conference" and culminating, if needed, with an appeals panel whose orders are subject to judicial review.[7]

The dispute giving rise to this appeal centers on the scope of a compensable injury Bubnis incurred in May 2003 when she was employed as a "curriculum facilitator" by LISD. After being briefly exposed to chemical fumes while working in an LISD middle school science lab,[8] Bubnis was treated by a doctor at an urgent-care clinic for eye, throat, and lung irritation and, about a month later, by an allergist for a persistent cough, sensitivity to fumes, vertigo, and fatigue. LISD contemporaneously reported Bubnis's inhalation injury to the DWC and, in its capacity as a self-insured governmental entity, did not dispute the compensability of Bubnis's injury and paid her medical bills as those charges were presented to it. Eventually, in late 2003, after the treating physician indicated that Bubnis's treatment for the compensable injury was completed and there was no additional activity on the file, LISD closed Bubnis's workers' compensation claim. As of that time, Bubnis had not missed any work for reasons she attributed to the exposure and injury and, in fact, she would continue to work for LISD into the fall of 2007.

In September 2007, however, Bubnis notified LISD that she was claiming additional workers' compensation benefits because she had since developed a panoply of ailments

---

[7] *See id.* §§ 410.021–.034 (benefit review conference), .101–.121 (arbitration), .151–.169 (contested-case hearing), .201–.209 (appeals panel), .251–.308 (judicial review).

[8] An incident report indicates that Bubnis had been searching through the lab for old or unused chemicals to remove and encountered fumes from numerous chemicals that had been stored in a closed cabinet. The chemicals were believed to include potassium permanganate ($KMnO4$), calcium hydroxide ($Ca(OH)2$), potassium hydroxide ($KOH$), ammonium dichromate (($NH4)2Cr2O7$), sodium nitrate ($Na NO3$), ammonium nitrate ($NH4NO3$), silver nitrate ($AgNO3$), p-dichlorobenzene, strontium nitrate ($SrNO3$), lead nitrate ($PbNO3$), barium chloride ($BaCl2$), and Guar gum.

she attributed to her May 2003 chemical exposure. These more recent problems manifested, according to Bubnis, in December 2006, when she experienced an adverse physical reaction—coughing and throat burning—to a new television set in her home. Although the television was removed, Bubnis claimed to have thereafter begun experiencing gradually increased hypersensitivity both to chemicals (reflected in a sore throat, coughing, fatigue, and difficulty breathing) and to electronics or electromagnetic fields (reflected by coughing, mouth burning, tingling sensations, tremors, head pain, fatigue, jaw pain, metallic taste, nervousness, and an inability to think clearly).[9] By the fall of 2007, Bubnis insisted, her condition had deteriorated to the point that she had to confine herself to her bedroom and could no longer work at LISD. Among other medical treatment Bubnis pursued,[10] she obtained diagnoses of "toxic encephalopathy,"[11] which the diagnosing doctor attributed to her 2003 chemical exposure, with accompanying anxiety

---

[9] The term "electromagnetic hypersensitivity" has been used to describe adverse reactions attributed to exposure to electromagnetic fields (EMF) sources—e.g., computers and mobile phones—including dermatological symptoms (redness, tingling, and burning sensations) as well as neurasthenic and vegetative symptoms (fatigue, tiredness, concentration difficulties, dizziness, nausea, heart palpitation, and digestive disturbances). The notion that humans can experience these sorts of adverse reactions from exposure to EMF sources is controversial. *See, e.g.*, World Health Organization, *Electromagnetic Fields and Public Health: Electromagnetic Hypersensitivity, fact sheet* (2005), *available at* http://www.who.int/peh-emf/publications/facts/fs296/en/ (last visited Feb. 23, 2015) (stating that electromagnetic hypersensitivity "has no clear diagnostic criteria and there is no scientific basis to link its symptoms to EMF exposure").

[10] E.g., having her dentist replace all of her fillings in an effort to treat her claimed jaw pain and metallic taste. The dentist indicated that the procedure alleviated the metallic taste, but not the jaw pain.

[11] The term "toxic encephalopathy" is used to indicate brain dysfunction caused by toxic exposure. *See* J. Firestone and W. Longstrength, *Neurologic & Psychiatric Disorders*, in *Textbook of Clinical Occupational & Environmental Medicine* 645 (Rosenstock & Cullen eds., 2004).

and depression.[12]   Treatment of her toxic encephalopathy, the doctor further indicated, would require medications costing approximately $10,000 per month.  Bubnis sought additional workers' compensation benefits for her losses related to her "toxic encephalopathy" and related anxiety and depression.

LISD disputed Bubnis's claim to additional workers' compensation benefits, asserting there was no causal link between the May 2003 compensable injury and the condition she complained of in 2007.[13]  Bubnis then filed a request for compensation.  After encountering some difficulties in locating a doctor who could accommodate Bubnis's demands for a chemical- and electronics-free examining environment, the DWC eventually named Francisco Velasquez, M.D., as the designated doctor in the matter.[14]  Velasquez examined Bubnis in February 2008.  He prepared an initial report finding that Bubnis's May 2003 compensable injury extended to the disputed diagnoses of toxic encephalopathy, anxiety, and depression and assigned a 30% whole-person impairment rating.  LISD then retained toxicologist Thomas Kurt, M.D., to conduct a peer review of the $10,000 per month prescription treatment recommended by Bubnis's diagnosing doctor for treating her toxic encephalopathy.  Kurt determined that the only "reasonable and necessary"

---

[12]   Although "toxic encephalopathy with resulting anxiety and depression" was the official diagnosis reported to LISD, Bubnis's doctor also described it as "toxic encephalopathy as well as a sensitized immune system resulting in hypersensitivity to chemical fumes/odors and intolerance to electromagnetic fields."

[13]   *See* 28 Tex. Admin. Code § 124.3(e) (Texas Dep't of Ins., Division of Workers' Compensation, Investigation of an Injury and Notice of Denial/Dispute).

[14]   Bubnis also refused to appear for a scheduled examination with a prior designated doctor because of her concerns that she would be exposed to electrical transmission lines while traversing the route to his office.

treatment for Bubnis was the anti-depressant/anti-anxiety drug Zoloft and that Bubnis's "perceived illness" was not work-related. Kurt further condemned, as "medically fraudulent" and "scientifically unsubstantiable in the peer-reviewed medical literature," a claim by Bubnis that her symptoms had included sensitivity to electromagnetic forces.[15] In response to Dr. Kurt's report, Velasquez declined to comment further "due to the lack of objective documentation since it is mainly subjective information that has been provided," noted that this was "out of the area of [his] expertise," and recommended that Bubnis be referred to toxicologist Patricia Rosen, M.D.

Because Dr. Rosen would not or could not accommodate Bubnis's requirement of a chemical- and technology-free examination environment, Bubnis did not show up for the scheduled appointment, and Rosen proceeded to issue a report based solely on her review of Bubnis's medical records. To summarize, Rosen concluded that the chemicals to which Bubnis had been exposed in May 2003 and the duration of that exposure would not likely have resulted in toxic encephalopathy. Rosen also noted that there were no reports in the peer-reviewed literature "that substantiate the possibility of being allergic or intolerant to electromagnetic fields," and opined that Bubnis's illness was "psychosomatic." Finally, Rosen concluded that Bubnis's ongoing illness could not be related to the May 2003 chemical exposure and, further, that the exposure itself would not have caused any pulmonary or other injuries. After reviewing Rosen's report, Velasquez amended his report to defer to and agree with Rosen's opinion, and "to reflect a 0% whole person impairment rating."

---

[15] Kurt's report reviewed each of the substances prescribed for Bubnis, opined why the substance was not reasonable and necessary for her treatment and, regarding one substance, noted that it had not been approved as a drug by the FDA. Kurt's report also suggested that Bubnis's treatment might subject her doctor to professional disciplinary action.

The parties proceeded to a DWC contested-case hearing. The Administrative Law Judge adopted Velasquez's initial 30% impairment rating and determined that Bubnis's May 2003 compensable injury was a producing cause of Bubnis's anxiety and depression, but that it was not a producing cause of her toxic encephalopathy. Bubnis did not challenge these determinations, but LISD did. After unsuccessfully seeking relief before the appeals panel, LISD brought suit for judicial review of the 30% impairment rating and the extent-of-injury determinations that included anxiety and depression.

A jury returned a verdict in favor of LISD, finding that Bubnis's compensable injury did not extend to anxiety and depression. The district court rendered judgment accordingly, reversing the appeals panel decision, declaring that "the injury at issue did not extend to include the diagnoses of anxiety and depression," and assigning a final impairment rating of 0% for that compensable injury. It is from the district court's final judgment that Bubnis now appeals.

## DISCUSSION

Bubnis challenges the district court's judgment in two issues. In her first issue, Bubnis insists that the jury's findings that her compensable injury did not extend to anxiety or depression were not supported by legally or factually sufficient medical evidence. In her second issue, Bubnis argues that the district court erred in assigning her a 0% impairment rating instead of the 30% impairment rating initially assigned by Dr. Velasquez.

**Standard of review**

The issues presented on appeal arise in the context of the judicial-review mechanisms the Legislature has prescribed in Subchapter G of Chapter 410 of the Act, which governs review "of

7

a final decision of the appeals panel regarding compensability or eligibility for or the amount of income or death benefits."[16] Subchapter G prescribes a "modified de novo" review process whereby the trial court informs the jury of the appeals panel decision on each disputed issue, and evidence regarding each disputed issue is limited to that presented to the DWC, unless the court makes a threshold finding that the claimant's condition has "substantially changed."[17] Furthermore, with respect to a dispute regarding an impairment rating, the trial court is to adopt the specific rating arrived at by one of the physicians in the case.[18] The party appealing the administrative decision (here, LISD) has the burden of proof by a preponderance of the evidence.[19]

We may sustain a challenge to the legal sufficiency of evidence only if the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact.[20] In determining whether a

---

[16] Tex. Lab. Code § 410.301; *see Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 253–55 (Tex. 1999) (holding that issues concerning impairment rating fall under section 410.301 because their resolution ultimately impacts the claimant's eligibility for or amount of income benefits).

[17] *See* Tex. Lab. Code §§ 410.304(a) (requiring jury be informed of appeals panel decision on each disputed issue), .306–.307 (admissible evidence).

[18] *See id*. § 306(c) (requiring court or jury to adopt certain impairment rating); *see also Texas Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 528 (Tex. 1995) (describing modified de novo review of such ratings).

[19] Tex. Lab. Code § 410.303.

[20] *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (quoting Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960)).

finding is supported by legally sufficient evidence, we view the evidence in the light most favorable to the finding, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not."[21] We indulge every reasonable inference that would support the finding.[22] In reviewing the factual sufficiency of the evidence, we consider and weigh all the evidence presented at trial, including any evidence contrary to the judgment.[23] We set aside a finding for factual insufficiency if it is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust."[24]

**Extent of injury**

The starting point for our analysis of Bubnis's challenge to the jury's extent-of-injury finding is the charge as submitted.[25] Reflecting LISD's burden at trial, Question 1 of the charge inquired, "Does Michelle Bubnis' compensable injury not extend to and include the following conditions: anxiety and depression?" The jury was instructed that compensable injury means "an injury that arises out of and in the course and scope of employment for which compensation is payable under the Texas Labor Code." With respect to both anxiety and depression, the jury was asked to select from the following alternatives "Yes, it does not extend to and include [the ailment]"

---

[21] *Id*. at 807.

[22] *Id*. at 822.

[23] *Plas-Tex, Inc. v. U.S. Steel Corp*., 772 S.W.2d 442, 445 (Tex. 1989); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

[24] *Cain*, 709 S.W.2d at 176.

[25] *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 762 (Tex. 2003) (factual-sufficiency review); *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (legal-sufficiency review).

or "No, it does extend to and include [the ailment]." The jury opted for the "Yes" alternative with respect to both anxiety and depression. In other words, the jury found that Bubnis's anxiety and depression were not related to the May 2003 chemical exposure. On appeal, Bubnis argues there is neither legally nor factually sufficient medical evidence to support these findings. We disagree.

LISD's theory at trial, simply put, was that even if the 2003 chemical exposure had caused Bubnis anxiety and depression, that particular bout with anxiety and depression had resolved by 2005 at the latest—i.e., prior to the December 2006 exposure to a television that purportedly triggered the ailments, including anxiety and depression, that were the basis for her claim for additional benefits. Bubnis's current anxiety and depression, LISD's theory continued, were not caused by the 2003 chemical exposure, but by her 2007 diagnosis of toxic encephalopathy or by the isolation created through her efforts to avoid EMF exposure. Therefore, LISD concluded, because the DWC found and Bubnis did not contest that her diagnosed toxic encephalopathy had been unrelated to the 2003 chemical exposure, it followed that the resulting anxiety and depression were likewise unrelated.

The evidence relating to the existence and cause of Bubnis's claimed anxiety and depression is relatively straightforward and, for the most part, undisputed. Bubnis's medical records reflect that she sought treatment in January 2004 for anxiety from the doctor she characterized as her "primary care" physician, James Merryman, D.O. Dr. Merryman's records indicate that Bubnis told him she was struggling with the injury from the chemical exposure and had started behaving in an "obsessive-compulsive manner about being around any kind of chemicals, or anything that could be construed as some kind of inhalation such as glue, or paint, etc." Concluding that Bubnis had "[g]eneralized anxiety with some depression and some obsessive-compulsive component,"

10

Merryman prescribed Zoloft for four weeks. He later authorized refills in February and May 2004 after examining her and concluding that she had "generalized anxiety" that is "[c]ontrolled by Zoloft."

Although Bubnis made other visits to Dr. Merryman, no other mention of anxiety, depression, or medications for such conditions appears in any of Bubnis's pre-2007 medical records in evidence here. To the contrary, records from an early 2006 visit by Bubnis to Michael Floyd, M.D., for treatment of urinary tract infections indicate that Bubnis was not taking any medications at that time. At trial, Bubnis confirmed that the records had accurately reflected the course of her medical treatments for anxiety or depression prior to the late 2006 television incident, testifying that Dr. Merryman had prescribed Zoloft for her only in January, February, and May 2004, and that he had been the only provider to do so prior to 2007.

The evidence also reflected that Bubnis sought psychological counseling from social worker Lee Fox Marley between September 2003 and January 2004 for "problems associated with a chemical accident on the job site in May 2003," and from psychologist Bonny Gardner from July 2004 through August 1, 2005 for the "ongoing anxiety about the effects of the chemical exposure." However, Bubnis had not presented any of the bills from these visits to LISD for remuneration under her workers' compensation claim.

Following the conclusion of her counseling with Gardner in August 2005, there was no evidence that Bubnis sought treatment regarding anxiety and depression until after (or in response to) the incident with the television in December 2006. Specifically, Bubnis testified that she first sought "counseling" about a tingling sensation she experienced in her legs after her reaction to the new television and, then, in February 2007, she saw Dr. Merryman again for an "allergy or some

11

type of adverse reaction to electronics." Bubnis attributed her electronic sensitivity to the May 2003 chemical exposure, but she also told Dr. Merryman, according to his patient notes from that visit, that she had "finally got over that." Dr. Merryman prescribed Zoloft after this visit "for the general anxiety."

In July 2007, Alfred Johnson, D.O., the doctor who had diagnosed her toxic encephalopathy (as well as her purported hypersensitivity to chemicals and electromagnetic fields) with resulting anxiety and depression earlier that year, referred Bubnis to health and behavioral scientist Nancy Didriksen, Ph.D., for a neuropsychological consultation. Didriksen's report opined that Bubnis's reported psychological problems stem mostly from the social isolation and withdrawal necessary to protect herself from exposure to EMFs, and she diagnosed Bubnis as having an adjustment disorder with anxiety and depression.

The jury was also presented with Dr. Rosen's analysis of Bubnis's diagnosis, briefly summarized above, and specifically her conclusion that—

> There is no data to support that the patient[']s ongoing illness[es] are related to her exposure to chemicals according to the materials provided. There is evidence that this patient likely has an affective disorder which would be completely unrelated to her work, workplace or any reported exposures. Therapy within the first day with humidified air would have been appropriate. The data supports that the patient did not suffer any pulmonary or other injury.

Likewise, the jury was provided with Dr. Velasquez's reports, including the addendum to his own report, also summarized above, which he added after reviewing Dr. Rosen's report:

> [A]fter careful review and consideration on the medical facts, I would have to defer to Dr. Rosen's opinion and agree with her impression. Therefore, Ms. Bubnis would not have any permanent impairment as related to her work exposure. I have attached

12

an Amended DWC 69 to reflect a 0% whole person impairment rating and I have also attached Dr. Rosen's report.

In testimony before the jury, Dr. Velasquez acknowledged that Bubnis had been diagnosed with anxiety and prescribed with Zoloft in 2004 and opined that Bubnis was then suffering from anxiety and depression. He also stated unequivocally that the May 2003 chemical exposure was not the cause of the more recent anxiety and depression. As to those conditions, he opined that Bubnis had been traumatized by the sheer number of doctors she had seen following the 2006 television incident and the receipt of so many diagnoses.

Finally, the evidence also includes a letter from Bubnis's husband in which he offers his opinion regarding her health status following the May 2003 chemical exposure. In the letter, her husband explains that Bubnis had been in "major distress" after the chemical exposure and had eventually become sensitive to chemicals and smells, but that after they had changed their lives dramatically, she had been "back to 85 to 90%" of her former self" before the TV incident in late 2006.[25] Somewhat relatedly, a colleague of Bubnis, who happens to be an LISD nurse, but who was not testifying in an expert capacity, recounted an October 2006 camping trip that she, Bubnis, and eighteen other women attended. The colleague testified that Bubnis had exhibited no symptoms during the trip and that Bubnis never mentioned anything about suffering from anxiety or depression. The colleague also noted that Bubnis had seemed healthy during the trip, but acknowledged that the camping trip took place out in the country.

---

[25] Bubnis disputes her husband's opinion of her change in health between the chemical exposure and television incident.

13

Viewing the foregoing evidence in the light most favorable to the verdict, and crediting the favorable evidence that the jury reasonably could have and disregarding contrary evidence unless the jury reasonably could not have, the jury could have reasonably inferred that (1) Bubnis had suffered anxiety and depression as a result of her May 2003 compensable injury for which she sought treatment from Dr. Merryman; (2) the anxiety and depression resulting from the May 2003 chemical exposure had resolved, either from treatment or on its own, at some time before the television incident or the toxic-encephalopathy diagnosis; and (3) Bubnis had developed a second bout of anxiety and depression in 2007 as a result of the toxic-encephalopathy diagnosis or from the isolation required by her environmental restrictions. As such, the evidence was legally sufficient to support the jury's finding that the May 2003 compensable injury did not extend to Bubnis's anxiety and depression.

Further, considering both the evidence supporting the finding and the contrary evidence on which Bubnis relies on appeal, we conclude that the contrary evidence is not so overwhelming as to render the jury's finding clearly wrong and manifestly unjust.[26] The contrary evidence here lies mainly in Bubnis's own testimony regarding the perceived cause of her anxiety and depression and Dr. Velasquez's initial impairment rating. Such inconsistencies merely go to the weight or credibility of the evidence, and were within the sole province of the jury to resolve.[27] Accordingly, we hold that the evidence was factually sufficient to support the jury's finding that the compensable injury did not extend to Bubnis's anxiety and depression.

---

[26] *See Cain*, 709 S.W.2d at 176.

[27] *Golden Eagle Archery*, 116 S.W.3d at 761.

14

In arguing the contrary, Bubnis insists that LISD failed to meet its evidentiary burden because—

1.  LISD and its third-party administrator conceded that Bubnis suffered from anxiety and depression as a result of the compensable injury;

2.  Dr. Velasquez agreed that Bubnis suffered from anxiety and depression as a result of the May 2003 exposure and also that Bubnis currently suffers from anxiety and depression;

3.  Records of other doctors acknowledge her prior and current anxiety and depression;

4.  There is no medical evidence that she does not currently suffer from anxiety and depression.

Bubnis's arguments overlook that the issue submitted to the jury—"Does Bubnis's compensable injury not extend to and include . . . anxiety and depression?"—focused on the existence (or not) of a causal link between Bubnis's compensable injury and her *current* anxiety and depression that is made the basis of her claim for additional workers' compensation benefits—not, as she suggests, whether she might ever have experienced anxiety or depression in the past relating to her compensable injury. The evidence, again, permitted the jury to find that no such causal link existed—i.e., that Bubnis's current anxiety and depression resulted from the 2007 toxic-encephalopathy diagnosis or the related isolation required to avoid EMF exposure, not from the inhalation injury suffered in May 2003. Accordingly, we overrule Bubnis's first issue.

**Impairment rating**

In her second issue, Bubnis challenges the district court's finding of a 0% impairment rating, arguing essentially that Dr. Velasquez's initial 30% rating is the sole impairment rating that

15

can be validly assigned in this case. We disagree, and would add that any error would be harmless or immaterial in light of the jury's finding regarding extent-of-injury.[28]

As mentioned, the Act provides remuneration to employees who are injured on the job,[29] including impairment income to any employee who sustains a permanent loss resulting from a compensable injury.[30] In fact, the Act requires that an employee with a compensable injury be assigned an impairment rating for that purpose.[31] But just as the Act requires an injury be a work-related injury—i.e., a compensable injury—its definitions of "impairment" and "impairment rating" also specify that the impairment must "result[] from a compensable injury."[32] Thus, only impairments that result from a compensable injury are entitled to impairment income under the Act.

Here, the jury found, and we upheld above, that Bubnis's compensable injury was not a producing cause of Bubnis's anxiety and depression or, stated in terms of the Act's definition of impairment, the jury found that Bubnis's anxiety and depression did not result from the May 2003

---

[28] *See* Tex. R. App. P. 44.1(a) (reversible error); *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011) (discussing harmless-error rule).

[29] *See Hulshouser v. Texas Workers' Comp. Ins. Fund*, 139 S.W.3d 789, 791 (Tex. App.—Dallas 2004, no pet.) ("A primary purpose of the Workers' Compensation Act is to relieve employees injured on the job of the burden of proving their employer's negligence and to provide them prompt remuneration for their on-the-job injuries." (citing *Payne v. Galen Hosp. Corp.*, 28 S.W.3d 15, 17 (Tex. 2000)).

[30] *See* Tex. Lab. Code §§ 408.121–.129 (impairment income benefits).

[31] *See id.* § 408.123; *see also id.* § 410.307(f) (requiring court or jury "in its determination of impairment" to adopt impairment ratings as set forth in section 408.123).

[32] *See id.* § 401.011(23) (defining "impairment" as "any anatomic or functional abnormality or loss existing after maximum medical improvement *that results from a compensable injury* and is reasonably presumed to be permanent") (emphasis added), (24) (defining "impairment rating" as "the percentage of permanent impairment of the whole body *resulting from a compensable injury*") (emphasis added).

16

chemical exposure. Bubnis's anxiety and depression, on the other hand, were the sole bases for Dr. Velasquez's initial 30% impairment rating. Thus, Bubnis's anxiety and depression, whether assigned a 0%, 30%, or 100% impairment rating, would not qualify for impairment income under the Act because it is not an "impairment" as that term is defined under the Act. In other words, even if we were to accept Bubnis's argument that Dr. Velasquez's since-rejected 30% impairment rating is the only valid impairment rating for her anxiety and depression, that rating would be immaterial to, and would not establish, Bubnis's ultimate entitlement to workers' compensation benefits. Accordingly, having overruled Bubnis's first issue regarding the extent of her injury, we likewise overrule her challenge to the impairment rating.

## CONCLUSION

Having overruled Bubnis's issues on appeal, we affirm the district court's judgment in favor of LISD.

_____
Bob Pemberton, Justice

Before Justices Pemberton, Field, and Bourland

Affirmed

Filed: March 25, 2015

17